THE GLENDALE WOOLEN COMPANY *against* THE PROTECTION INSURANCE COMPANY.

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

21  19
59  186
21  19
62  570
21  19
73  45
21  19
183U3324

In relation to the contract of insurance, there is an important distinction between a *representation* and a *warranty :* the former, which precedes the contract of insurance and is no part of it, need be only materially true ; the latter is a part of the contract, and must be exactly and literally fulfilled, or else the contract is broken and inoperative.

It was provided in one of the conditions of insurance annexed to the policy, that the survey and description of the property should be deemed a part of such policy, and a warranty. The survey consisted of interrogatories and answers. One of the interrogatories was—" Is there a watchman in the mill, during the night ?" To which the answer was—" There is a watchman, nights." The property insured was destroyed by fire, on the night following the setting of the sun on *Saturday*, and the fire was first discovered on the morning of *Sunday*, while it was yet dark ; during which period, there was no watchman in the mill. Held, that the survey contained a clear engagement, by the insured, that they would keep a watchman in their mill, *through* the hours of *every* night in the week ; which engagement being broken, there could be no recovery on the policy.

Where there is no imperfection or ambiguity in the language of a contract, it will be considered as expressing the entire and exact meaning of the parties ; and no evidence of extrinsic matters or usages will be received to vary the terms expressed.

THIS was an action on a policy of insurance, to recover the sum of 12,500 dollars, insured against loss by fire, on a mill, machinery, stock, &c., owned by the plaintiffs.

The cause was tried, on the general issue, with notice of special matter to be given in evidence, at *Hartford, January* term, 1851.

On the trial, the plaintiffs introduced in evidence the policy of insurance on which their action was brought, and proved the execution thereof, by the defendants, and the countersigning thereof, by *Plunkett & Hurlburt*, their agents.

Among the CONDITIONS OF INSURANCE, annexed to the policy, the 18th was as follows : " When a policy is made and issued upon a survey and description of certain property, such survey and description shall be taken and deemed to be a part and portion of such policy, and warranty on the part of the assured."

The survey referred to in the policy, and made part thereof, was also introduced ; and its execution by the plaintiffs, and its delivery to the defendants, were admitted.

*Hartford,*
*June, 1851.*

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

The caption of this document was—" SURVEY of a cotton or woolen mill, on which insurance is to be predicated." It contained 26 interrogatories, with blanks to be filled up with answers, by the defendants. The 8th interrogatory was as follows : " Is there a watchman in the mill, during the night ? Is there also a good watch-clock ? Is the mill left alone, at any time, after the watchman goes off duty in the morning till he return to his charge at evening ?" To these questions the defendants made the following answers opposite thereto. " There is a watchman, nights—No clock—Bell is struck every hour from 8, *P. M.*, till it rings for work in the morning." To the last question the answer was—" Only at meal-times, and on the *Sabbath,* and other days when the mill does not run."

The 15th interrogatory was—" During what hours is the factory worked ?" Answer, " *Summer,* commence at 5 o'clock, *A. M.*, work till dark—*Winter,* commence as soon as we can see, in the morning, work till 8, *P. M.*, except occasionally running over-time nights, to even up the work."

At the bottom of the sheet containing the interrogatories, was a letter addressed to the applicants, requesting them to fill up the blanks ; on the receipt of which the insurance company said, they would promptly advise them (the applicants) of the rate at which the company would grant a policy thereon.

It was proved, that *Plunkett & Hurlburt,* at the time when said insurance was effected, resided in *Pittsfield, Mass.,* and that the negotiations for the insurance were made between the plaintiffs and *Thomas Plunkett,* one of said agents, at *Pittsfield,* which was the only negotiation on the subject ; and that the policy was countersigned and delivered to the plaintiffs, at *Pittsfield.*

But the defendants claimed, and introduced evidence to prove, that the agents had no power, in the present case, to do any thing but to receive surveys and proposals, and take the advice of the insurance company ; and that the policy and survey were sent by said agents before the policy was delivered, to the office of the company in *Hartford,* for advice and approval.

It was proved, that the practice of the defendants was, and had before been, to send to their agents abroad blank

policies of insurance, signed by the president and secretary of the company, and to be countersigned by their agents, when insurance was effected by them ; and that the policy in question was thus executed.

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

The plaintiffs claimed, that *Plunkett & Hurlburt* were the general agents of the defendants ; which the defendants denied, and introduced evidence to prove, that they never empowered their agents abroad, and had not authorised *Plunkett & Hurlburt*, to make any verbal contracts on their account, nor to make an insurance to a greater amount than 10,000 dollars, without consulting the defendants ; and that, in the present case, the agents had consulted and taken the advice of the defendants, before the policy was delivered, as before stated.

But it was not claimed nor proved, that the plaintiffs had any knowledge that the powers of the agents were in any other way restricted than appears on the policy.

It was proved, that the mill and buildings covered by the policy, were consumed by fire, and damaged to a much greater amount than was insured thereon by the defendants, on the night next following the setting of the sun on *Saturday*, the 7th day of *April*, 1849 ; and that the fire was first discovered between the hours of 3 and 4 o'clock, on the morning of *Sunday*, the 8th day of *April,* and while it was yet dark ; and that, when there was no watchman at the mill ; and the cause of the fire is not known.

It was agreed, that the plaintiffs had made all the preliminary proofs of loss, &c., required by the terms and conditions of their policy of insurance.

The plaintiffs introduced evidence to prove, and claimed they had proved, that it was the usage and practice of the plaintiffs' mill, when the survey was made, and had been, for a long time before, the practice at the plaintiffs' mills which stood on the same site, the principal one of which had not long before been consumed by fire, to employ a watchman at those mills ; and that the custom at such mills was, and always had been, for such watchman to leave the mills at 12 o'clock on *Saturday* night, and to return at 12 o'clock on *Sunday* night, unless fires had been kept later than usual on *Saturday* night, *i. e.* after 4 o'clock, in which case the watchman remained on duty until the fires were out.

*Hartford,*
June, 1851.
—————————
The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

The workmen left the mill at 4 o'clock on *Saturday, P. M.,* and the fires were put out then, the year round. On other days, the watchman commenced duty when the mill stopped at night, and the workmen left, which was at 8 o'clock in *Winter,* and at —— in *Summer,* and continued until the hands commenced work in the morning; and that the bell was struck hourly, when watchmen were on duty, including the hour of 12 o'clock. This usage of the plaintiffs' mill was proved by the superintendent of that mill.

The plaintiffs then enquired of the witness, if this practice or usage was not general in the cotton or woolen factories, and if it was not known to the defendants' agents in *Pittsfield,* when the policy was effected.

To this enquiry the defendants objected; and after argument, the court overruled the objection, and admitted the evidence.

The plaintiffs then introduced several witnesses, to prove, and claimed that they had proved, that the same usage which had prevailed at their mill, prevailed also at various other woolen and cotton factories which they named, and which were located in the county of *Berkshire,* and that such practice was common, so far as their knowledge was concerned, and as they believed, and which testimony conduced to show that said usage was common, general, and well known in the county of *Berkshire,* and was known to the defendants, and their said agents; which usage was denied by the defendants, and that they or their agents had any knowledge thereof.

And also the plaintiffs offered to prove, by the superintendent of their mills, and he testified, that when said survey was made, and on many former occasions, he had communicated to *Plunkett,* as agent of the defendants, the aforesaid usage and practice at the plaintiffs' mill, of watching as aforesaid; and that said usage was well known to *Plunkett,* when the insurance was effected, and when the policy was issued; and especially that *Plunkett* had often visited the mills, and made enquiries regarding said watch, and when the examination for the policy in question was made, and at all such times, had been informed of the practice in said mill; and they claimed, that such usage should be considered in giving a construction to the policy, and the jury should be so instructed; but they were not.

And the plaintiffs offered testimony to prove, that the policy was actually delivered after this, but was dated back to the 11th *September*, 1848 ; which the defendants denied.

*Hartford*,
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The    Protec-
tion Insurance
Company.

To all this evidence the defendants objected, among other reasons, on the ground that all previous negotiations, state-ments and propositions, were merged in the written contract or policy, and could not be received to affect or vary the legal construction thereof, or of the survey attached thereto.

And the plaintiffs claimed, among other reasons for admit-ting such evidence, that it appeared from the policy and sur-vey, that the language thereof, in respect to watching in the mill, was ambiguous and equivocal; and that the *Sabbath* commenced at 12 o'clock, *P. M.*, of *Saturday*, after which labour was prohibited, except works of necessity and charity, by the statute law of *Massachusetts*, which they read.

The court overruled said objection, and admitted the evi-dence ; and thereupon the plaintiffs claimed and requested the court to charge the jury, that if the usage in the county of *Berk-shire* as they claimed, was proved, and known to *Plunkett & Hurlburt*, when the policy was issued, it must be presumed, that it was effected in reference to such usage, especially as the policy, as they claimed, was ambiguous ; and if the plaintiffs had conformed to such usage, as they claimed they had, that it was a sufficient compliance with the terms and fair meaning of the survey regarding keeping watch in the mill, as expressed in the answers propounded under the 8th interrogatory in the survey ; and that the survey ought then to be construed in reference to such usage, and in conform-ity with it.    And the plaintiffs also claimed, that if such usage was common and well known in the county of *Berk-shire*, and if *Plunkett & Hurlburt* resided therein, when acting as the agents of the defendants, and were the general agents of the defendants, as the plaintiffs claimed ; that the law would presume that they had knowledge of such usage ; and requested the court so to instruct the jury.

But the court did not instruct the jury on these matters.

The plaintiffs further offered evidence to prove, and claim-ed they had proved, that the usage and custom of their mill, was, to commence work, in *Summer*, at 5 o'clock, *A. M.*, and in *Winter*, as soon as the workmen could see to work ; and in *Summer*, to work till dark, and in *Winter*, till 8, *P. M.*,

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v,*
The Protec-
tion Insurance
Company.

except occasionally, when there was overwork, and except on *Saturdays.*

The defendants, in their defence, claimed, and asked the court to instruct the jury, that the answers to the several interrogatories propounded in the survey, were, in law, warranties, and not representations merely, and especially the answers to the questions put under the 8th interrogatory, and that they must be proved to be strictly true and complied with, by the plaintiffs, in keeping watch in the mill, according to their obvious import and meaning.

The plaintiffs denied this, and claimed that the answers were not to be considered as warranties, and were not so in law, but were representations only ; and especially they claimed such to be the law of the commonwealth of *Massachusetts*, by which they claimed this policy was to be adjudged ; and as evidence of this, they cited and read the reported case of *Houghton* & al. v. *Manufacturing Mutual Insurance Co.,* 8 *Metc.* 114.   And the defendants claimed an instruction to the jury on this question, in conformity with their claim.

But the court did not so instruct the jury.

The defendants introduced much evidence to prove, and claimed that they had proved, that the absence of a watchman from the mill from 12 o'clock on *Saturday* night to 12 o'clock on the succeeding *Sunday* night, during the night seasons, much increased the risk and hazard ; and that there was no such usage as claimed by the plaintiffs in woolen or cotton mills that were watched nights, either in *Connecticut* or elsewhere.

And thereupon the defendants claimed, that because there was no watchman in the mill on duty from 12 o'clock on *Saturday* night of the 7th day of *April,* 1849, until 12 o'clock on *Sunday* night of the said 8th day of *April,* and especially as the mill was burned up, as the defendants claimed, when no watchman was on duty in the mill, the plaintiffs had broken their warranty, and could not recover, notwithstanding any such and all such usages and practice, as the plaintiffs claimed.  And the defendants requested the court so to instruct the jury, as matter of law, and the legal construction of the answers to the questions propounded under the 8th interrogatory in the survey.

But the plaintiffs claimed, that although there was no watchman on duty in the mill from 12 o'clock on *Saturday* night of the 7th day of *April*, until the mill took fire and was consumed; yet the absence of a watchman, during that time, was justified and permitted, by the fair and legal construction of the terms and language of the survey taken together, and especially by the true and legal meaning of the answers to the 8th interrogatories therein, as determined by the laws of the states of *Massachusetts* and *Connecticut.* And they therefore claimed, that if the answers were in law warranties, and not representations merely, they had not broken, but had performed and kept the same, although no such usage or usages as they claimed, had been proved.

On the subject of the meaning and legal construction of the survey, and the answers to the 8th interrogatories, the court did not charge as the plaintiffs claimed, but did charge the jury, *pro forma*, that the answers to the several interrogatories in the survey, and especially the answers to the 8th interrogatories, were warranties, and not merely representations, and so made by the terms of the policy; and that it was the duty of the plaintiffs to have complied with them, according to their fair and obvious meaning. That the question in the 8th interrogatory, " Is there a watchman in the mill during the night," means, is there such watchman through the night? And that the answer, " There is a watchman, nights," is an affirmative answer to the question, meaning, in this connexion, *every* night, and *through* the night. The meaning of the word "nights," in this answer, means the time of darkness, between the leaving of the mill by the workmen for the day, and their usual time of returning to the mill the next day or morning. By the word " *Sabbath*," in the same answer, is meant the space of time on *Sundays*, from the time when the watchmen, on other days, ordinarily leave the mill in the morning, until their ordinary time of returning in the evening. And therefore, if there was no watchman on duty in the plaintiffs' mill, from 12 o'clock on *Saturday* night of 7th *April* until the next *Sunday* night at 12 o'clock, or until the mill was discovered to be on fire; and if the mill was left alone, during that time, according to the common practice of the mill; that this was a breach of the plaintiffs' warranty; and that in such case, the plaintiffs

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

Hartford,
June, 1851.
———————
The Glendale
Manufactur-
ing Company
v.
The Protec-
tion Insurance
Company.

could not recover, unless they had proved to the satisfaction of the jury, that the practice and usage of their mill, was observed, in the present instance, and was a general, uniform and notorious usage and practice at the manufacturing establishments of cotton and woolen goods, in which watch-men were kept. But that such usage need not have been universal. Nor would it be considered as general, if confined to a comparatively small portion of mills, or in a contracted region of country. But if such general and notorious usage was proved, the policy and survey should be construed in reference to it, and the plaintiffs could then recover, otherwise not. And the jury were directed specially to find, whether such general, uniform and notorious usage was proved.

The jury returned a verdict for the plaintiffs; and upon being inquired of, by the court, how they found the usage submitted to them, to be proved, they replied, that they had not agreed upon that question.

Whereupon the court returned them to a second consideration of the case, saying to them, that they had disregarded his instructions, and omitted to find a verdict upon the only question of fact submitted to them in the case, viz., the question of general and notorious usage.

The jury came again into court, and inquired, if they should find that there was such an usage in the county of *Berkshire*, as the plaintiffs claimed, whether as matter of law, this would amount to a general usage, within the meaning of the charge?

The court replied, that a general usage necessary to be proved, if it existed at all, existed irrespective of municipal lines such as the boundaries of towns, counties, or states; and that the question was, whether in the opinion of the jury, there was such an usage in the region where the plaintiffs' mill was situated, as in their opinion, to constitute a general usage. That the question of usage, was a question of *fact* for them to determine, and must be so extensive and notorious in the general region of country in which the plaintiffs' mill was situated, as to satisfy them, that it was a general, uniform and notorious usage. And one of the jurors enquired of the court, whether if the jury should find a general usage in the county of *Berkshire*, in that class of

mills which put out their fires at 4 o'clock on *Saturday* after-noon, as claimed by the plaintiffs, it would be sufficient ?

*Hartford*,
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

To which the judge replied, I know of no distinction in classes of mills; I think the usage must be general, uni-form and notorious among cotton and woolen mills.

Whereupon the jury finally rendered their verdict for the defendants; which the court accepted.

The plaintiffs thereupon moved for a new trial for a mis-direction.

*Toucey* and *Chapman*, in support of the motion, contended,

1. That the knowledge of the defendants' agent will affect the company. He had an unlimited power of attorney. There was no notice of any restrictions. *Perkins* v. *Washington Ins. Co.* 4 *Cowen* 645.

2. That the contract is to be construed by the laws and usages of *Massachusetts*, where the contract was made, the assured lived and the property was situated; and according to those laws, the answers are *representations* rather than warranties; and it is sufficient if the statements were made in good faith, and substantially true, and substantially com-plied with. *Hazard*, admr. v. *New-England Marine Ins. Co.* 8 *Peters* 560. *Houghton* v. *Manufacturers' Mutual Fire Ins. Co.* 8 *Metc.* 114.

3. That it is *no part of the contract* that there should be a *full answer.* If there was a *concealment* of a fact material to the risk, by withholding information called for, in such a way as to mislead the insurer, there is a complete and per-fect remedy, independently of any stipulation in the policy. The fact and mode of disclosure may be the subject of war-ranty, or conditions precedent; otherwise, they are collateral.

4. That there is no warranty, that the mills were watch-ed on the *Sabbath*, or any part of it. *Gates* v. *Madison County Mutual Ins. Co.*, 3 *Barb. Sup. C. R.* 73. *S. C.* 2 *Comst.* 48.

5. That the words are vague, general, ambiguous, and may have divers meanings; and parol evidence is admissible to shew the sense in which they were used. And therefore, there may be proof of a general or local usage to affect the party with knowledge; or of the usage or habit of trade, or conduct of an individual, which is known to the person who

*Hartford,*
*June, 1851.*

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

deals with him; or direct proof of the knowledge and understanding of the parties, by conversation at the time, or admissions afterwards.  1 *Stark. Ev.* 429.   *Gray* v. *Harper,* 1 *Sto. R.* 574.   *Catlett* v. *Pacific Ins. Co.* 1 *Wend.* 561. 576. *Hartt* v. *Hammet,* 18 *Verm. R.* 127.   *Birch* v. *Depeyster,* 1 *Stark. Ca.* 210.   *Peisch* v. *Dickson,* 1 *Mason* 10. 11. 19.   3 *Cowen's Phil. Ev.* 1358. 1412.   *Cole* v. *Wendel,* 8 *Johns. R.* 90, (2nd ed.)   6 *Serg. & R.* 171.   2 *Greenl. Ev.* § 251. and cases cited *in notis.*

6. That the charge is erroneous, because it excludes the general usage of *Massachusetts,* and requires that the usage not only be general in *Woolen* mills, but in *Cotton* mills also.

7. That the court erred in taking the whole case from the jury, when there were several questions which should have been submitted to them.   3 *Cowen's Phil. Ev.* 1414. 1420. *Jennings* v. *Sherwood,* 8 *Conn. R.* 122. 127.   The *United States* v. *Breed,* 1 *Sumn.* 159.   *Heald* v. *Cooper,* 8 *Greenl. R.* 32.   *Williams* v. *Gilman,* 3 *Greenl. R.* 276.   *Rushforth* v. *Hadfield,* 7 *East,* 224.   *Gibson* v. *Culver,* 17 *Wend.* 305. *Van Ness* v. *Packard,* 2 *Peters,* 148.   *Taylor* v. *Briggs,* 2 *Car. & Pa.* 525.   (12 *E. C. L.* 245.)   *Cole* v. *Wendel,* 8 *Johns. R.* 90. (2nd ed.)   *Kilgore* v. *Bulkley,* 14 *Conn. R.* 363.   *Chitt. Cont.* 82, 3.

*Hungerford* and *T. C. Perkins,* contra, contended, 1. That the survey is part of the policy, and the plaintiffs' statements therein contained are *warranties* on their part.   *Routledge* v. *Burrell,* 1 *H. Bla.* 254.   *Worsley* v. *Wood,* 6 *Term R.* 710.   *Alston* v. *Mechanics Mutual Ins. Co. of Troy,* 4 *Hill,* 329.   *Burritt* v. *Saratoga County Mutual Fire Ins. Co.* 5 *Hill,* 188.   *French* v. *Chenango Mutual Ins. Co.* 7 *Hill,* 122.   *Jennings* v. *Chenango Mutual Ins. Co.* 2 *Denio,* 75.   *Egan* v. *Mutual Ins. Co. of City and County of Albany,* 5 *Denio,* 326.   *Gates* v. *Madison County Mutual Fire Ins. Co.,* 2 *Comstock,* 43.   *Houghton* v. *Manufacturers' Mutual Fire Ins. Co.* 8 *Metc.* 114.

2. That the plaintiffs, by omitting to continue a watchman at their mill after 12 o'clock on *Saturday* night, neglected to perform a condition precedent, the performance of which was essential to a right of recovery, and especially as there is much reason to believe, that the presence of the

watchman would have prevented the loss. The answers to the questions embraced in the 8th interrogatory clearly and explicitly affirm the continuance of the watchman *through the night*, and until the morning.

3. That the testimony of the superintendent, that he acquainted *Plunkett* with the custom, at the plaintiffs' establishment, to dismiss the watchman at 12 on *Saturday* night until 12 on the following night, or that *Plunkett* had knowledge of such usage, was not legally admissible ;—because, first, the contract being in writing, all preliminary negotiations and propositions were merged in the written agreement, and no parol evidence could be admitted to vary, controul or contradict the written agreement. As a general principle this is believed to be elementary. 1 *Greenl. Ev. p.* 398. § 275. and authorities cited. 2 *Denio,* 75. Secondly, the answers to the questions in the above interrogatory are quite explicit, that the watchman was continued *through the night,* and left in the morning ; and the testimony given by the superintendent and objected to, was, that he told *Plunkett,* and that *Plunkett* knew the usage to be, for the watchman to leave at 12 on *Saturday* nights, in direct opposition to the statement in the survey, which could not lawfully be done.

4. That the effect of such an alteration of the contract would be, to make the company responsible upon a supposed contract resting partly in writing and partly in parol, while neither *Plunkett* if he were the defendants' general agent, nor the company themselves, could make any other insurance than in writing. *Marsh. Ins.* 198. 1 *Phill. Ins.* 7. *Hughes Ins.* 115. *Ohio Rep.* 148.

5. That the questions under the 8th interrogatory were put for the express purpose of ascertaining the usage of the mill, in regard to a watchman ; the answers purport to state that usage : and the testimony of the superintendent is to disprove the usage stated, and that he so informed the company, in direct opposition to the statement in the policy. And the usage, which was attempted to be established by this testimony, is also in direct opposition to the statement contained in the answer to the 15th interrogatory, where it is said the work continued till 8, *P. M. Jennings* v. *Chenango Mutual Ins. Co.* 2 *Denio,* 75.

6. That the general usage, supposed and claimed by the

*Hartford,*
June, 1850.

The Glendale Manufacturing Company
*v.*
The Protection Insurance Company.

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

plaintiffs, was not admissible ; because, in the first place, the enquiries under the 8th interrogatory and in the 15th interrogatory, are made expressly to ascertain the particular usages of the plaintiffs' mill ; and these are explicitly stated in the answers ; and the object of proving the general usage, is, to protect the plaintiffs in departing from the particular usages stated, by shewing a different general usage, and the plaintiffs' conformity with that general usage ; which cannot lawfully be done, as it would entirely overrule the express terms of the contract.   Secondly, no usage can be admitted to contradict the explicit terms of a written contract, or to controul or vary them.   *Schooner Reeside,* 2 *Sumn.* 567. *Rogers* v. *Mechanics Ins. Co.* 1 *Sto. R.* 603. 607.   *Macomber* v. *Parker,* 13 *Pick.* 175.   14 *Pick.* 141.   *Eager* v. *Atlantic Ins. Co.* 14 *Pick.* 141.   *Allen* v. *Dykers,* 3 *Hill,* 593. *Yates* v. *Pym,* 6 *Taun.* 446.   Thirdly, if the particular usages of the plaintiffs' establishment were as represented, it was of no consequence what the general usage was.

7. That the instruction of the judge in regard to the usage, was correct, with the single qualification, that it was somewhat too favourable for the plaintiffs.   *Sto. Cont.* § 14. *Schooner Reeside,* 2 *Sumn.* 567.   *Rogers* v. *Mechanics Ins. Co.* 1 *Sto. R.* 603. 607.   *Leach* v. *Perkins,* 5 *Shep.* (17 *Maine*) 462.   *Crosby* v. *Fitch,* 12 *Conn. R.* 410.

The usage, allowing it to exist, has no tendency to prove, that the language used in the policy was otherwise used than in its common acceptation.   It does not prove, nor have a tendency so to do, that any word used in the policy, or all taken together, have any other signification in the county of *Berkshire,* or where the usage was claimed to exist, than everywhere else.   The usage is directly incompatible with the language used in the questions and answers embraced in the 8th, and also in the 15th, interrogatory, taken in their general acceptation ; and the usage in no respect tends to divert their meaning from their common import, or shew that they were ever understood otherwise.

Further, it is so indefinite, that the law cannot recognise it as a valid usage ; because, in the first place, it must be so certain and uniform, that each party contracting in reference to it, may from the usage know the rights and the obligations which the contract confers or imposes ; whereas, in

this case, no person contracting as watchman, can from the usage know when he may leave on *Saturday* night at 12 o'clock, or when he must stay after that time, or leave before. Secondly, an operative contracting in reference to the usage, can never determine when he may leave at 4 o'clock in the afternoon of *Saturday*, or must remain longer. Thirdly, the usage, if not to be construed as if the word *generally* were inserted in the latter branch, is incongruous and inconsistent with itself.

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

ELLSWORTH, J. We have delayed the decision of this case, that we might more fully reflect upon the important questions presented, and come to a decision that would be satisfactory to ourselves.

We shall not follow the learned counsel, over all the ground taken by them, in the argument; nor comment upon all the law of insurance which they have so earnestly pressed upon our notice, but only such, as we consider applicable and important in arriving at a just decision of the case in hand.

The contract of insurance, as all know, is a contract of indemnity, upon the terms and conditions specified in the policy of insurance. It is a peculiar contract—and one of hazard purely. The insurer undertakes, for a comparatively small premium, to guaranty the insured against loss or damage, upon the exact terms and conditions agreed on, and upon no other. The party called upon to pay in case of loss, may therefore justly insist upon the fulfillment of these terms; and if the plaintiffs can now bring themselves, fairly, within the conditions of the policy, as they insist they can, they are entitled to recover for the loss; but if they cannot, then they must admit they cannot recover; however well-meaning and upright, and however confident in their view of the terms and conditions of the policy. We may not *make* a new contract for the parties; but rather it is our duty to enforce and carry out one already made.

What that contract is, upon a just interpretation of the facts and provisions of this survey and policy, we consider entirely clear and certain.

But before entering upon this question, we remark upon another, much dwelt upon in the argument, and of general

*Hartford,*
June, 1851.
————————————
The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

importance; the distinction between a *representation* and a *warranty*. The former precedes, and is no part of the contract of insurance, and need be only materially true; the latter is a part of the contract and policy, and must be exactly and literally fulfilled, or else the contract is broken and the policy becomes void. And although this distinction is not important, as we conceive, in this instance, nor the other point so much urged, that the policy is to be construed by the laws of *Massachusetts*, and not by the laws of this state, (though we think they are the same, in a case situated as this is,) it may not be unimportant to observe, that the above distinction, if applied, in all its stringency and technical exactness, to fire policies, must, ere long, present questions of unusual interest and importance.

Fire policies are issued upon certain interrogatories and answers, denominated the *survey*, often extending over two or more pages, and embracing, not only the present, but the future condition of things, and the future conduct of the insured; while marine policies are usually taken out for a single voyage, or if on time, for one of short duration. We are by no means confident that representations in surveys, preceding the issuing of fire policies, extending, as they do, to the present and future condition of the property about to be insured, have been considered as technical warranties, to be true to the letter, for a long series of years, and not rather as representations, to be, at the time and thereafter, substantially exact and true. Nor are we certain, that a mere reference to these representations made in the body of the policy, in order to explain the rights and obligations of the parties, does, necessarily, change their character from representations to warranties. Fire policies are taken out in mutual offices, for a term of years, and in ordinary insurance companies, for one year or a longer period. If now all the interrogatories and answers, or *survey*, as it is called, are to be held to be warranties, to be kept to the letter during the continuance of the policy, and not in the nature of representations to be kept in substance and effect; and if this vital change in what is only preliminary, is to be brought about, by a mere reference, in the body of the policy, to the survey; then there is a principle of the law of marine insurance being applied to policies of a different character, which

must ere long, as we have said, present questions of unusual interest and importance.   If, on the other hand, the survey is held to be a representation or agreement, extending to the future, as well as the present, condition of things; then the insured will have no ground of complaint, as in that case, he will be holden only to a substantial compliance with his own agreement, which is but just and right.

*Hartford,*
*June, 1851.*

The Glendale Manufacturing Company *v.* The Protection Insurance Company.

This question has engaged the attention of courts elsewhere.   In *Houghton* v. *the Manufacturers Mutual Fire Insurance Company*, 8 *Metc.* 114., there were 36 printed questions annexed to the policy—among them were these:  "What provision is made for extinguishing fire by engines, pumps, water-casks, buckets or otherwise?"  *Answer*—"Water-casks are placed in each room containing water, and pails are kept in each room.   There is a force-pump inside to convey water into the second and third stories."   "Is a watch kept constantly in the building?  If no watch is kept constantly, state what is the arrangement respecting it."   *Answer*— "No watch is kept in or about the building; but the mill is examined thirty minutes after work."   "During what hours is the factory worked?"   *Answer*—"Five o'clock *A. M.* to $8\frac{1}{2}$ o'clock *P. M.*   Sometimes, extra work will be done in the night."   The plaintiffs then claimed, that the policy and application were to be construed together, in order to determine what was the contract of the parties—that the statements made in the application, and especially the answers to the questions, were stipulations in the nature of conditions precedent, for the truth of the matter stated, so far as they were material to the risk; and if not true, although not wilfully false, nor made with intent to deceive, they nevertheless discharge the underwriters; that so far as these answers stated usages, practices and modes of conducting business at that factory, in the nature of precautions against fires, and tending to diminish the risk of fire, the in sured were bound to observe all such usages and modes of conducting their business; and continue to use all such precautions; and if they failed so to do, the underwriters were discharged.

The court held, 1. That the policy, by the manner in which it refers in terms to the application and representations, does legally adopt and embody them, as part of the

*Hartford,*
*June, 1851.*

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

contract, to the same effect as if they were recited and set forth at large in the policy.    2. That the application and various answers contained in it, being termed "*representations*" in the policy, are rather to be regarded as having the legal effect of representations than of warranties, as understood in the law of marine insurance, though partaking, in some measure, of the character of both.    They are like representations in requiring that the facts stated shall be substantially complied with, but not like warranties in requiring an exact and literal compliance.

These answers were held to be embodied in the policy as a part of the contract of insurance, and they would hence, strictly, be warranties, in marine policies, to be satisfied only by an exact and literal performance.    But this consequence is avoided, by holding the answers to be representations, although for the future, and although incorporated in the policy itself.    They were obligatory only, as an executory undertaking, satisfied by performance in substance and effect.

In the *Farmers Insurance and Loan Company* v. *Snyder*, 16 *Wend.* 481., the question was, whether a certain survey referred to, thus, in the policy : "more particularly described in application and survey furnished by themselves (the plaintiffs), filed, No. 938, in the office of the underwriters"—was a representation, or a warranty.    It was adjudged to be a part of the contract, and therefore not a representation collateral and preparatory to the contract ; yet the chancellor, in giving the opinion of the court, would not admit it was a warranty.    His language is :—"I have doubts whether the principle of construing every matter of mere description contained in the body of the policy, although not material to the risk, into an express warranty, which is to be literally complied with, should be applied, with the same strictness, to *fire* policies."    *P.* 493.

In *Alston* v. *The Mechanics and Mutual Insurance Company of Troy*, 4 *Hill* 330., the chancellor, in giving the opinion of the court, goes at great length into the distinction between representations and warranties.    He utterly repudiates the idea of a *promissory* representation, and insists that no such thing is recognised, by any respectable authority whatever ; while at the same time, if the promissory

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

representation is embodied in the policy, so as to be a part of the contract, it will be binding as something in the nature of a warranty, or a representation, as in *Massachusetts,* to be substantially and materially true.  *P.* 342.

In *Wood* v. *The Hartford Fire Insurance Company,* 13 *Conn. R.* 533. 545. this court seem to have applied the strict technical rules of marine insurance to fire policies, and they accordingly held, that language in a policy as follows : " upon the one undivided half of the paper-mill owned by the plaintiff in *Westville* in *New-Haven,*" under the circumstances, made a warranty, and that the mill must continue to be a paper-mill, neither more nor less, or the policy would immediately become void.  This application of the rule, if the court concurred in the views expressed by its organ, seems to maintain the entire similarity between marine and fire policies.  And this is undoubtedly true, if it be conceded, that the description and reference in the policy, makes a warranty.  But we are not aware, that the court meant to hold, that in all cases, every thing which gets into a policy, as description or mere reference, whether survey or answers, is an exact warranty, and not representation.  This would be a very broad principle of law, of great importance, demanding mature and careful consideration, before we sanction it, and one which we are not called upon to decide, in this case ; because, however the general principle may be, here there is no question of the kind for decision.

It is certain that in this case, the plaintiffs have not kept their agreement in substance or effect.  And besides, the parties have *agreed,* in the 18th condition of the policy, that, the survey shall be treated as a *warranty.*

We would add further, that the general question is elaborately discussed in *Jennings* v. *Chenango County Mutual Insurance Company,* 2 *Denio* 75., and many cases are commented on.  The words of reference there in the body of the policy are : " Reference being had to the application &c. for a more particular description of the conditions annexed, as *forming a part of this policy.*"  The court held, that as the survey was made a part of the policy, then, by the acknowledged rule of marine insurance, it became a warranty, and must be literally true, and so continue.  Many cases are likewise cited, in the learned opinion of the court, given

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

by *Jewett,* J. going to shew, that most, if not all, the evi-
dence offered and relied upon, by the plaintiffs, in the case
before us was not admissible or important,—such as prior or
contemporaneous conversation or agreements between the
parties, the knowledge of the agent—local usages, and any
and every circumstance or collateral proof, intended to qual-
ify or contradict the written contract, in the survey and
policy,

The same views are presented, by the chancellor, in giv-
ing the opinion of the court already referred to in *Aston* v.
*The Mechanics Mutual Insurance Company.*

We come, then, to the immediate question before us.
What is the contract, as to the particular in question, in this
policy of insurance ?   We say it is, in our judgment, an exact,
clear and certain engagement, by the insured, that they will
keep a watchman in their mill *through* the hours of *every*
night in the week, from 8 *P. M.,* to the usual hour of com-
mencing work in the morning.   If this is the true engage-
ment of the plaintiffs, then they cannot recover on the
policy ; for it is conceded by them, that they had no watch-
man in the mill after 12 o'clock *Saturday* night, and the mill
was burnt down between 3 and 4 o'clock the next morning ;
which doubtless would not have happened, had the watch-
man remained, as he should have done.   If we have the
*precise* contract which the parties chose to make for them-
selves, and there be no imperfection or ambiguity in the
language used to express the meaning of the parties ; clearly
we have no right to depart from the language, and travel
out of the contract, to see if the parties did not, after all,
mean something different from what is written.   Why, we
ask, resort to inferior and secondary evidence, such as infer-
ences from supposed usages, or circumstances or the knowl-
edge, or the talk, of the parties, at the time of entering into
the contract ?   These may be proper enough, where there is
ambiguity or uncertainty in the language used, as when
technical and scientific words are used, or terms of art, or
trade, or foreign language, or phrases, which require an inter-
pretation or explanation, in order to know what the parties
meant.   But this is not the case.   And hence, the numerous
authorities and elementary writers read by the plaintiffs'
counsel, shewing that collateral evidence may be, in certain

cases, resorted to, to interpret the terms used, are quite inapplicable and unimportant. See *Stoever* v. *Whitman's lessee,* 6 *Binn.* 416. *Allen* v. *Dykers,* 3 *Hill,* 593. 596. *The Schooner Reeside,* 2 *Sumn.* 567. 569. *Macomber* v. *Parker,* 13 *Pick.* 175. 182.

*Hartford,*
June, 1851.

The Glendale
Manufacturing Company
*v.*
The Protection Insurance Company.

The rule is well established, that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversation, or circumstances, or usages &c., in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. *Higginson* v. *Dall,* 13 *Mass. R.* 96. *Whitney* v. *Haven, Id.* 172. *Wiggin* v. *Boardman,* 14 *Mass. R.* 12. *Cheriot* v. *Barker,* 2 *Johns. R.* 346. *Atherton* v. *Brown,* 14 *Mass. R.* 152. *Weston* v. *Emes,* 1 *Taun.* 115. *Flinn* v. *Tobin* 1 *Mood. & Malk.* 367. *Parks* v. *General Interest Insurance Co.* 5 *Pick.* 34. *Barber* v. *Brace,* 3 *Conn. R.* 9.

We must first be convinced that there is doubt and ambiguity in the writing, or we cannot admit inferior evidence to explain or contradict what is written. This principle constitutes the great difficulty in the plaintiffs' case. We know not how to get around it, or to surmount it; and we must not reject or evade it. The plaintiffs must first satisfy us, as we say, that the contract is imperfect and ambiguous, or we cannot, with any consistency and fairness, help them to subject the defendants.

The defendants insist, that the contract is not only certain, but just as it should be made, and as they understood it was to be made; that they expected to have a watch, each night in the week, and through the night; and if **we** are to go into reasons, that, during *Saturday* and *Sunday* nights, the mill is as much exposed to spontaneous combustion certainly, and more exposed from attempts by incendiaries, than at other times in the week; and they earnestly insist, that the plaintiffs shall not erase from the policy the half of *Saturday* and *Sunday* nights. We acknowledge that we feel pressed by this view of the case, and we find

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

no answer to it in the argument of the plaintiffs' counsel. As the counsel so earnestly insist we are in error, we look again to see if we are ; but we find none. The language in the 8th interrogatory and answers, (for here is the imperfection and mistake, if anywhere,) used by the insured, leaves no room for hesitation or doubt. If language can express thought, it is expressed in this instance. The survey begins " plain and definite answers are requested to each of the following interrogatories." " Please be particular." Then the interrogatory is—" Is there a watchman in the mill during the night ?" The word " during" is to be construed with reference to the subject matter. If one were to promise another, that he would do some act, such as execute a deed, or pay a sum of money, *during* the month of *January,* the word means a point of time between the first and last days of *January :*—but, in a deed conveying land to a woman during her widowhood, it means the whole time, so long as the grantee shall remain unmarried. So a soldier enlisting into the army *during* the war, is to serve throughout the war. But if we say, a man was killed *during* the war, or that a certain battle was fought *during* the war, we mean some point of time between the commencement and end of the war. So in this survey, what did the underwriters aim at, in this interrogatory ? We think they sought to know, if there was a watch kept up *all the night,* not a *part* of it, or for *one* period of time in the hours of the night. But the interrogatory proceeds : " Is there a good *watch-clock ?*" Here we find something that is to speak for every hour of the night. It is well known, that a watch-clock is so constructed, that at an exact time in each hour of the night, the watchman can insert a plug into a hole that just then appears through the face of the clock, and after that, it is covered and concealed, so that the plug cannot, by any possibility, be inserted without destroying the clock itself ; and so the clock will disclose the fatal truth, in the morning. If the watchman has slept or absented himself, he is betrayed. Does not this prove the meaning of the word " *During* ?" Look now at the answer. " There is a watchman, nights— no clock—bell is struck *every hour* from 8 *P. M.* till it rings for work in the morning." *Every* hour in the night then is included in this survey.

The interrogatory, up to this point, having embraced each and every hour of the night, proceeds : " Is the mill left alone, at *any time after* the watchman goes off duty in the morning, till he returns to his charge at evening ? The answer is " only at meal-times, and on the *Sabbath*, and other days, when the mill does not run." We feel confident this last interrogatory relates only to day-time ; for the words are, " after the watchman goes off duty in the *morning* till he returns to his charge at *evening*." We cannot think, that any part of the night is excepted from the vigilance of the watchman.

*Hartford,*
June, 1851.
—————
The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

Is there any more ground for the plaintiffs' other claim, that one half of *Saturday* and *Sunday* nights are to be excluded from the watch ? We see nothing that indicates such an exception. The language of the parties does not ; the reason of the thing does not. The language is general— during the night. What nights ? *all* nights—one as much as another. And why draw a distinction, contrary to the language in its plain import—and the reason of the thing too ? Why is a watch required *any* night ? For the same reason that exists for *every* night. And there is an additional reason, as we have already mentioned, for a watch during *Saturday* and *Sunday* nights. If however, in this particular, there be a shade of difference, it is too slight and unimportant for us to proceed upon, and impose a restriction upon language, which is general and unqualified.

But it is said, the second part of the interrogatory and answer, shows, that these portions of the two nights are to be excepted. To us it appears quite the reverse. It is obvious, the second part of the interrogatory has nothing to do with a watch, during the night. The first part is expressly occupied about the night ; and, as we may say, exhausts that topic and subject matter ; and so does its answer. The second part of the interrogatory then follows ; and the inquiry is, as to the time *after* the watchman goes off duty in the *morning* till he returns to his charge at evening —— "*i. e.* is the mill *ever* left alone in the *day* time ?" The answer is, in substance and meaning, *never*, except at meal-times, and the day of the *Sabbath* and other days. It does not reach back to the first part of the interrogatory, as is claimed, departing from the subject matter of enquiry, to say what

*Hartford,*
June, 1851.

The Glendale
Manufactur-
ing Company
*v.*
The Protec-
tion Insurance
Company.

is done in the night season, either one night or another. It is what is done in the *day-time?* The nights have been already disposed of. We say, then, the 8th interrogatory covers *every* night, and every *hour* of the night; every day, and every hour of the day; and that the answer, by excepting only meal-times, the day time of the *Sabbath* and other days when no work is done, leaves a clear engagement that at all other times, there is to be a watchman or workmen in the mill.

This engagement, as we interpret it, might have been considered, by the underwriters, as important, if not indispensable, in giving terms of insurance; and we cannot, therefore, disregard it, in meting out even justice to the contending parties.

According to these views, then, it is obvious, that the superior court was correct in the course pursued; and that no sound objection lies to the principles of law laid down to the jury.

If indeed the survey was to be taken in connexion with a general custom, claimed to prevail in mills of this character, then too there was no error; for such evidence was received, by the court; and the jury, under the instructions of the court, found there was no such custom in fact. On what possible ground the plaintiffs could claim, that evidence of a practice in their particular mill, or usage within any defined locality, as in the county of *Berkshire,* &c. even if brought to the knowledge of the defendants' agent, (and his authority to bind the defendants, by such knowledge, we do not decide,) should be received, and when received, vary the existing contract, we know not. All previous and cotemporaneous conversation, as a part of the *final* contract, is wholly unimportant and inadmissible; nor is it admissible as matter of representation; for the survey contains *that;* and the survey may not be contradicted, by either party. We repeat, the parties made their own contract in the case of this mill; and so long as the terms of it are clear and certain, it must put an end to all strife about what was intended.

It is claimed by the plaintiffs' counsel, that the statute of *Massachusetts* respecting the observance of the *Sabbath,* has a bearing upon the construction to be put on the language of the survey. We do not so understand it. We do not be-

lieve there is any statute in *Massachusetts* making it unlaw- <span style="float:right">*Hartford,*<br>June, 1851.</span>
ful to keep a watchman in this mill according to the survey,
as we interpret it ; and if there was, the contract to keep
such a watch every night, and every hour of the night, is too
plain to be denied ; and is, besides, in the nature of a pre-
cedent condition, which must be fulfilled, or the underwrit-
ers are discharged.

We do not advise a new trial.

In this opinion the other judges concurred.

New trial not to be granted.