## THE STANDARD FUR CUTTING COMPANY vs. CALEDONIAN INSURANCE COMPANY OF SCOTLAND.

Third Judicial District, New Haven, January Term, 1931.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, JS.

Argued January 22d—decided April 6th, 1931.

*Charles J. Martin,* for the appellant (defendant).

*William H. Comley,* with whom was *Robert Alexander,* for the appellee (plaintiff).

HINMAN, J. The complaint alleged and the defendant admitted that machinery, equipment, stock and other personal property contained in the plaintiff's fur-cutting factory in Danbury, were insured under a policy issued by the defendant and that, on March 3d, 1927, practically all of the property was destroyed by fire. The defendant interposed several special defenses, one of which—the third—alleged breach of a provision in the policy requiring maintenance of watchman service in a specified manner. We confine our present attention to this defense, and recite only those of the facts found which pertain thereto.

The policy was in standard form and contained the following provisions: "In consideration of a reduced rate of premium it is hereby warranted that the insured shall maintain watchman's service, hourly rounds being recorded nights upon approved recording stations or approved watch clock." The plaintiff employed a watchman who regularly commenced work at six o'clock each night and was engaged to continue until six o'clock the following morning, making hourly rounds of the factory. He had been employed by the plaintiff since 1922 and, so far as the officers of the company had observed, had been trustworthy and reliable. He reported for duty at five-thirty o'clock p. m., on March 3d, 1927; there was no evidence as to

his doings thereafter. The fire occurred shortly before eleven-thirty-seven p. m.

The plaintiff, for a long time prior to the fire, had provided an approved watch clock of standard type, so constructed that when a key chained to the factory building at each of several stations or locations was inserted and turned, the number of the station and the time of the insertion would be recorded on a paper dial inside of the clock, each station having a different number and striking place on the dial. The clock was contained in a metal case consisting of two parts securely closed by a locking device operated with a key other than the keys used for recording rounds on the dial. That part of the clock used in making recordings on the dial contained inside of the case of the clock was known as the striking plate or matrix and could only be reached by one of the station keys inserted into a slot in the case of the clock, or by opening the clock and unlocking the case. There was a key which unlocked and locked the metal case and by which the clock could be opened and paper dials on which recordings were to be made easily placed therein or removed therefrom. When the case was unlocked and open, the dials on which the recordings were made were easily manipulated by hand and moved around so that all stations could be marked on the dial in a very short period of time and made to appear as if made by hourly rounds throughout the night.

On the day of the fire, and for a long time prior thereto, the key which unlocked the case, and the blank dials, were kept in the desk of Mr. Culhane, secretary and treasurer of the plaintiff company, in the office of the factory building and were accessible to the watchman at any and all times. The watchman,

with the knowledge and consent of the plaintiff and its officers, used this key to open the clock and change the dials therein, at all times except when absent due to temporary illness. By having access to the key he could manipulate the mechanism of the clock in the manner above stated. No precaution was ever taken by the plaintiff to have the key under the control of some other person than the watchman, and the plaintiff never provided any other person to remove or insert the dials. The watch clock was in perfect running order, mechanically and physically capable of accurately recording the time and number of any station punched thereon by the watchman. After the fire it was found in the ruins directly under the peg upon which it was customarily hung when not in use, and when broken open contained a paper dial with no stations recorded thereon.

Frequent inspections of the premises and of the fire prevention devices were made by inspectors furnished by various organizations in the interest of the insurers. No instructions were ever given the plaintiff by them as to the manner of keeping and operating the watchman's clock and its appurtenances, except that in October, 1926, an inspector inquired of Mr. Culhane as to who had charge of the watch clock, to which inquiry Culhane replied that he had charge of it. The further finding that "in so stating, Culhane acted in good faith and upon the assumption that as the officer of the company in immediate charge of the plaintiff's business, he was in charge of the clock within the meaning of the inspector's question," is attacked and we eliminate it as lacking support in evidence or fairly admissible inference, although we regard it as immaterial to the result.

As to the third defense, the trial court reached con-

clusions that "(1) The clause relating to the watch-man and the use of a watch clock is a warranty. (2) On the night of the fire the watchman failed to perform his duty in making hourly rounds. (3) The mere fact that on the night of the fire the plaintiff's watchman failed fully to perform his duty did not in itself constitute a violation of the policies of insurance or work a forfeiture thereof. The fact that the watchman had access to the clock key and to the dials did not constitute a violation of any provision of the policy."

Several assignments of error pertain to different aspects of these conclusions. In considering them, we are spared the necessity of determining whether this watchman clause is a warranty, or a provision of less stringent obligation and force—a question which has proven to be of considerable difficulty in numerous cases. Here the requirement is expressly a warranty and is to be given effect as such. Our problem concerns the meaning and application of the undertaking. "The word 'warranted' dispels all ambiguity, and supersedes the necessity of construction" as to the nature of the provision. *Wood* v. *Hartford Fire Ins. Co.* (1840) 13 Conn. 533, 544; *Glendale Woolen Co.* v. *Protection Ins. Co.* (1851) 21 Conn. 19; *Bennett* v. *Agricultural Ins. Co.*, 50 Conn. 420.

In construing a warranty the usual rules applicable to insurance contracts apply. "If the terms are plain and unambiguous, they must be accorded their natural and ordinary meaning; the court cannot indulge in forced construction, nor so distort provisions as to give them a meaning evidently not intended by the parties." *Komroff* v. *Maryland Casualty Co.*, 105 Conn. 402, 406, 135 Atl. 388. The statement is to be construed to impose such obligations only as it can

be reasonably presumed the parties intended. *Mc-Gannon* v. *Miller's National Ins. Co.*, 171 Mo. 143, 71 S. W. 160, 94 Am. St. Rep. 778. If there are provisions of doubtful meaning, that construction which is most favorable to the insured is to be adopted. *Dresser* v. *Hartford Life Ins. Co.*, 80 Conn. 681, 70 Atl. 39. The latter rule cannot be invoked to change the nature of the contract or nullify the insured's express and unequivocal agreement. 26 Corpus Juris, p. 198.

The policy provision with which we have to deal leaves little room for construction. It very clearly requires that a watchman's services be utilized to maintain oversight of the insured property, in the familiar and generally-accepted and understood sense. In addition it requires that this oversight consist of or include such periodical inspections as are involved in and would be afforded by an hourly round of all of such recording stations as were prescribed or approved by the insurer, and that these hourly visits to each station should be recorded in a manner likewise approved. The importance of these latter stipulations cannot be overlooked or minimized; the frequency of inspection tours was of obvious materiality, affecting the hazard and risk and inducing a concession in the premium charge, and the recording system, if properly conducted, was manifestly a proper and trustworthy safeguard that such oversight of the premises would be maintained, as well as reliable evidence that it had been.

As to compliance with a warranty in a contract of insurance, the general rule is that its terms must be strictly and literally fulfilled or the contract is vitiated. "This means that there can be no variance or departure in any particular as to any matter warranted,

since the validity of the entire contract depends on absolute truth and conformity, the very purpose and meaning of a strict warranty being to preclude all questions as to the purpose, if any, for which it was made; and this, whether a breach proceeds from negligence, misinformation, or to whatever cause noncompliance is attributable." 4 Couch, Cyclopedia of Insurance Law, § 870. The multitude of cases cited (p. 2866) to this proposition include *Glendale Woolen Co.* v. *Protection Ins. Co., supra,* and *Kelsey* v. *Universal Life Ins. Co.,* 35 Conn. 225. In *Wood* v. *Hartford Fire Ins. Co., supra,* it was held (p. 544) that "a warranty excludes all argument in regard to its reasonableness, or the probable intent of the parties," and the following doubtless extreme but illustrative example was stated: "If a house be insured against fire, and the language of the policy is, 'warranted, during the policy, to be covered with thatch,' the insurer will be discharged, if, during the insurance, the house should be covered with wood or metal, although his risk is diminished." The effect of breach is to release the insurer, whether the breach diminished or increased the risk, or was committed for good or bad reasons, and whether it was with or without the consent of the insured. 4 Couch, p. 2869.

In several States statutes have been enacted providing that unless the breach of warranty or condition materially increases the risk or contributes to the loss it will not effect a forfeiture of the benefits of the policy. 26 Corpus Juris, p. 196. A tendency has also been manifested by courts in some cases to relax to some extent the strict rule of literal fulfillment of warranties and to sanction, instead, substantial compliance, usually measured by that which a prudent business man, acting in good faith, would have done

to carry out the prescribed requirements. 1 May on Insurance (4th Ed) § 156; *McGannon* v. *Michigan Miller's Mutual Fire Ins. Co.*, 127 Mich. 636, 644, 87 N. W. 61.

In cases involving warranties that a watchman shall be maintained or kept on duty in the insured premises, determination as to whether the warranty had been so satisfied as not to defeat recovery because of breach has been made to depend, frequently, upon whether the assured had used due care and diligence in employing trustworthy persons and exercised reasonable supervision to see that the required watch was maintained. Most of these cases concern warranties requiring the keeping of a watchman on duty during periods and in a manner somewhat generally designated, and the claimed breach usually consisted in the temporary absence of the watchman from the premises. The considerable diversity of conclusions is doubtless due largely to varying terms of the policy provisions involved and the differing factual situations and circumstances presented. 4 Couch, p. 3445. The following cases are fairly illustrative: *King Brick Mfg. Co.* v. *Phœnix Ins. Co.*, 164 Mass. 291, 292, 41 N. E. 277; *London & Lancashire Ins. Co.* v. *Gerteisen*, 106 Ky. 815, 51 S. W. 617; *McGannon* v. *Michigan Miller's Mutual Fire Ins. Co., supra; Hanover Fire Ins Co.* v. *Gustin*, 40 Neb. 828, 59 N. W. 375; *Blumer* v. *Phœnix Ins. Co.*, 45 Wis. 622, 633; *Theriault* v. *California Ins. Co.*, 27 Idaho, 476, 149 Pac. 719, Anno. Cas. 1917D, 518; *Andes Ins. Co.* v. *Shipman*, 77 Ill. 189, 193; *Gibson* v. *Farmers & Mechanics Ins. Co.*, 13 Ohio Dec. (Reprint) 629; 3 Cooley's Briefs on Insurance, p. 2732; 4 Couch, § 972.

Many of these authorities afford support to a contention that derelictions on the part of a watchman

which are without the knowledge or reasonable contemplation and beyond the immediate control of the employer do not constitute such a breach of a warranty for the maintenance of a watchman as to defeat recovery, and that if this case presented only a situation where, on the night in question, the watchman, without his employer's knowledge, had temporarily deserted the premises, or failed wholly or in part to make hourly rounds of the stations, or, although having made the rounds neglected to utilize the watch clock to record them, a breach forfeiting the insurance would not necessarily be created thereby.

However, this is not the determinative point of the case, as we view it. The fatal fault, in our judgment, is that of the plaintiff in failing to comply with the watch clock warranty, either in letter or spirit. The important purpose and utility of such a requirement is graphically stated in *Glendale Woolen Co.* v. *Protection Ins. Co.* (21 Conn. p. 38): "Here we find something that is to speak for every hour of the night. It is well known, that a watch clock is so constructed that at an exact time in each hour of the night, the watchman can insert a plug into a hole that just then appears through the face of the clock, and after that, it is covered and concealed, so that the plug cannot, by any possibility, be inserted without destroying the clock itself; and so the clock will disclose the fatal truth, in the morning. If the watchman has slept or absented himself, he is betrayed." While the finding shows that the watch clock provided in the instant case was different in operation, its purposes manifestly were the same. The maintenance of hourly inspections of the plaintiff's premises, with the resulting protection against the inception of fire or its progress through delay in discovery, was a material

element in the contract of insurance and in procuring a concession in the premium charge. A necessary effect of a proper operation of the recording system was to provide, by rendering certain the exposure of any neglect or variation, a compelling incentive to the watchman to regular and punctual performance of the required periodical rounds. It also was designed to afford to the employer, and to the insurer on occasion, positive and reliable evidence that the prescribed watch had been faithfully and regularly maintained. It is obvious that any departure from or relaxation in control of the operation of the watch clock system which rendered ineffectual and nugatory the incentive, mechanical supervision, and safeguards dependent upon it cannot reasonably be regarded as other than a material breach of a warranty calling for the maintenance of such a system. The effect of the action of the plaintiff in giving its watchman access to the clock key and dials was to expose him to the temptation, and to place it in his power, to omit, wholly or in part, the performance of the required hourly rounds, and enable him to conceal his defaults and avoid the consequences by so manipulating the apparatus as to falsely indicate that the rounds had been made. It is manifest that the entrusting of access to the mechanism of the clock to the watchman himself, instead of retention of control in an officer of the company or a trustworthy third person would not be approved or tolerated by the insurer. When an inquiry was made by its representative, if the true situation had been disclosed doubtless the arrangement would have been vigorously discountenanced. Instead, the plaintiff's executive gave assurance which fairly could not have been understood otherwise than as meaning that he, personally, was exercising that control. The effect

of the plaintiff's course of conduct was to create a mere appearance of conformity. Whether it was deliberate or negligent is immaterial; it is sufficient that it was voluntary. *Union Marine Ins. Co.* v. *High*, 153 Ark. 156, 239 S. W. 741. The consequence is that the relevant facts found establish and constitute a breach of the warranty contained and inherent in the watchman clause of the policy, not only under the principle requiring strict and literal observance, but also under the more liberal rule which is satisfied by substantial compliance, and require a conclusion to that effect instead of that reached by the trial court that "the fact that the watchman had access to the clock key and to the dials did not constitute a violation." The effect of this breach was to render the policy void and deprive the plaintiff of a right of recovery thereunder. *Wood* v. *Hartford Fire Ins. Co.*, and *Glendale Woolen Co.* v. *Protection Ins. Co.*, *supra;* 3 Cooley's Briefs on Insurance (2d Ed.) p. 2791. The defendant was entitled to judgment on grounds set forth in its third defense. As this conclusion is decisive of the case, it is unnecessary to discuss the further assignments of error relating to the efficacy, upon relevant facts found (which, for the same reason, need not be stated), of the second defense, alleging violation of the sprinkler clause, and the fourth and fifth defenses based upon claimed false statements, by an officer of the plaintiff corporation, after the fire, as to the amount of plaintiff's indebtedness and that it had lost no money in the operation of its business.

There is error, the judgment is set aside, and the case remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.