THE AU SABLE LUMBER COMPANY v. THE DETROIT MANUFACTURERS' MUTUAL FIRE INSURANCE COMPANY.

*Fire insurance—Conditions of policy—Lights—Watchman.*

1. An agreement in an application for insurance on a saw-mill, "not to use movable, open lights," is construed to relate to the

general and ordinary use of lights in and about the mill, and not to their special and necessary use in making repairs permitted to be made by the express terms of the policy.

2. An application for insurance of mill property contained an agreement on the part of the insured to keep a watchman on the premises at all times when the mill was not in operation, and the policy provided that, if the insured should fail to keep any of the agreements therein contained, the company should not be liable in case of loss under the policy; which forfeiture clause is construed as though the words "during such failure" followed the word "policy," so far as the agreement to keep a watchman is concerned.

3. The temporary absence of a watchman on saw-mill premises, for the purpose of obtaining a padlock and key which he had left at the boarding-house, 300 feet from the mill, and which he desired to use on the premises, cannot be regarded as a violation of an agreement on the part of the mill-owners in an insurance application to keep a watchman on the premises at all times when the mill was not in operation.

Error to Bay. (Cobb, J.) Submitted on briefs November 20, 1891. Decided December 22, 1891.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*Wisner & Draper,* for appellant, contended:

1. The declarations respecting the watchman and open, movable lights are promissory warranties on the part of the insured that such condition shall continue during the life of the policy, and the effect of a breach is to annul the policy, without regard to the materiality, or whether the breach had anything to do with producing the loss; citing 1 Wood, Ins. § 179 *et seq.; Ripley v. Insurance Co.,* 30 N. Y. 136; *Bank v. Insurance Co.,* 50 Id. 45; *Insurance Co. v. Arthur,* 30 Penn. St. 315; *Whitlaw v. Insurance Co.,* 28 Up. Can. C. P. 53.

2. We submit that no watchman, within the meaning of the policy, was on the premises during the day-time; but if the book-keeper and barn man can be regarded in any sense as such watchmen, then whether or not a watch suitable in view of the conditions was kept was a question for the jury; citing 1 Wood, Ins. § 178, p. 415; *May v. Insurance Co.,* 25 Wis. 291; *Glendale Woolen Co. v. Insurance Co.,* 21 Conn. 19.

*McDonell & Hall,* for appellant.

McGRATH, J.   Defendant, a mutual company, issued a
policy covering plaintiff's saw-mill, etc., which was after-
wards consumed by fire, and this suit is brought to
recover the loss.   The policy contains the following
printed clauses:

"Permission given for $45,000 concurrent insurance
herewith, running nights, and making necessary repairs
and alterations or improvements at all times, and to use
refined kerosene or lard-oil, or gas generated on the
premises, for lights.   For a more particular description
of the insured property, reference is made to the orig-
inal application and survey No. 1,466, on file, which is
hereby made a part of this policy, and a warranty on
the part of the assured."

"1. *Deposit note.*   The said insured has become a mem-
ber of said company by depositing, in addition to the
cash premiums, his note for the sum of $675.00, payable
as therein specified, but in no event shall the said
insured be called upon to pay more than the face amount
thereof.

"2. *Application.*   This insurance is based upon an
application of the insured, filed in the office of this
company, of even number and date with this policy,
which application is made a part of this contract, and a
warranty on the part of the insured; and if the insured
shall fail to keep any of the agreements therein con-
tained, this company shall not be liable in case of loss
under this policy.

"3. *Warranty.*   The insured, by the acceptance of this
policy, hereby warrants that any application, survey,
plan, statement, or description connected with procuring
this insurance, or contained in or referred to in this
policy, is true, and shall be a part of this policy; that
the insured has not overvalued the property herein des-
cribed, nor omitted to state to this company any infor-
mation material to the risk; and this company shall not
be bound under this policy by any act of, or statement
made to or by, any agent or other person which is not
contained in this policy or in any written paper above
mentioned."

The application contains the following questions and
answers:

" Are you the sole owner of the property to be insured (exclusive of the land)?

"*Yes.*

" Age of building?

"*Rebuilt 1882.*

" Is it occupied by owners?

"*Yes.*

" What is the present cash value of property to be insured, exclusive of land and property not specified?

"*$60,000.*

" What is the value of land? Is there any incumbrance?

"*Yes.*

" What is the amount and character of incumbrance, to whom payable, and when?

"*$28,000. A. Chesbrough. Will be paid off this year.*

" What part of principal or interest is past due and unpaid?

"*None.*

" Do you own the land in fee-simple?

"*Yes.*

" If land is leased, when does lease expire? Does lease contain privilege of renewal? Is there any litigation, present or threatened, affecting the title to any part of the property?

"*No.*

" How much insurance is there on the property in addition to this application?

"*About $35,000.*

" It is concurrent?

"*Yes.*

" Is there any insurance by mortgagee in his own name to your knowledge?

"*No.*

" Do you agree to keep watchman on the premises at all times when not in operation?

"*Yes.*

" Is smoking permitted, except in office?

"*No.*

" Have you any reason to fear incendiarism?

"*No.*

"Do you agree not to use movable, open lights on the premises insured?

"*Yes.*

"Do you agree to keep barrels of water and buckets on each floor?

"*Yes.*

"And the undersigned applicant hereby warrants the above answers to be full, true, and material to the risk, and agrees that the statements contained in the contract in reference to occupation, title, incumbrance, and other insurance shall be continuing warranties."

Defendant resisted payment on the ground that the agreements on the part of the plaintiff to keep a watchman upon the premises, and not to use movable, open lights on the premises, had been violated.

A. P. Coulter was the secretary of the defendant company, and solicited and took the application, which was filled out partly by Mr. Carrington, the secretary and treasurer of the plaintiff company, and partly by Mr. Coulter. It appeared that Coulter applied to Carrington for the application, saying that he had looked the property over, and wanted a policy thereon; that, in filling out the application, Carrington, referring to the question regarding the use of open lights on the premises, told Coulter that he (Carrington) had been connected with saw-mills for 20 years, and that a mill could not be repaired without the use of torch-lights, and that they were necessary for use, and Coulter replied, "Why, in our policies we give you permission to make repairs at all times;" that these torch-lights were in use by plaintiff at that time, and Coulter knew that fact.

The fire occurred on Saturday, the 5th of April, 1890, at about 9 o'clock at night, before the mill commenced operations for the season, and while they were engaged in making repairs and fitting the mill out for the season's work. On the date named, the engineer and fireman had been engaged at the pony engine, a part of which had been taken out and sent away for repairs, and they were putting the parts together. They were at work under the engine-room floor, putting the pipes together, and used a torch or flambeau. It appears that

this light was lighted when the use of that particular kind of light was necessary, and, when not needed, was extinguished; that its use was occasional; that it was used where, on account of a spray of water, or by reason of the inability to throw the light on the point desired, a lantern could not be used; that certain of the repairs that were being made upon that day could not have been made with an inclosed light; that it was safer to use the torch than a lantern, under some circumstances; that on the day in question no lights were left by those making the repairs; that for general lighting purposes an electric light was used in the mill; that the torch-light was used in the engine-room only, or around the belts or hot boxes while a spray was being put on. One of the witnesses, when asked why it was necessary to use the flambeau, said:

"Because you have to get so close to any particular piece of machinery that you cannot use a lantern. In shifting a belt, if the belt runs off a pulley part way, it takes two men; one holds the lantern or the flambeau, and the other drives the wedge until the belt runs perfectly true on the pulley; and you could not use anything else there, because it would be dangerous if you should strike the lantern with the belt; you have got to get close to it, and it might make an explosion. Then, another thing is, you can put your hand over it in a second, and crush the light out of it. It is just like a tallow candle, that you can put your hand over it in an instant and put it out. * * * Where there is a hot box, where you put water on it, put a spray on, you cannot use a lantern for it. You hold this right next to it, and water does not affect it any. The spray of water flying into it does not affect it. * * * It certainly was necessary, because you cannot get anything else close, and you can push this right into a piece of machinery, and get a perfect light right where you cannot use a lantern."

This testimony came from defendant's witnesses, and was in the main drawn out by defendant, and was uncontradicted. The watchman went on duty a few

minutes before 6 o'clock, after those engaged in repairing had left, and closed up the mill. It was not claimed that there was any connection between the use of this torch-light and the fire.

The facts, then, are that the policy itself gives permission to make necessary repairs, and to use refined kerosene (the article used in this torch) for lights, and it further appears without contradiction or dispute that it was necessary to use the torch-light in making the repairs. The granting of permission to make repairs naturally presumes increased hazard in the doing of the thing permitted, and that permission must be deemed to have included all the incidents of that privilege, or the right to do whatever was usual and necessary in the course of such repairs. The agreement, therefore, not to use open, movable lights must be construed to relate to the general and ordinary use of lights in and about the mill, and not to the special and necessary use in making the repairs permitted by the express terms of the policy.

As to the keeping of the watchman, it appeared that the mill had been shut down in December of the previous year; that in the mean time, and up to the time of the fire, a night watchman had been employed, who went on shortly before 6 o'clock p. m., and remained there until the next morning; that from December up to the time of the commencement of the repairs, in the latter part of February, there had been no person about the mill in the day time who was denominated a "watchman," but from the time the watchman left in the morning until he came on again in the evening the mill was in charge of the book-keeper and barn man, whose duty it was to look after and care for the property; that, after the repairs were commenced, other persons were also about

the mill. These facts were undisputed. The object of the agreement respecting the watchman was the care and supervision ,of the mill property, and, if the care and supervision was exercised by any one, it cannot be material that such person was not called a "watchman." The functions of a watchman need not necessarily be performed by a person called a "watchman," in order to protect both parties. If performed by the proprietor himself, it cannot be said that the agreement has been violated.

But this mill was destroyed during the presence of a watchman in the actual performance of his duties, and not in the absence of a watchman. The policy does provide that if certain specified articles are kept upon the premises without permission, or if the insured shall make any false representation of the condition, situation, or occupancy, or shall conceal any fact material to the risk, or in case of overvaluation, etc., the policy shall be void, but it does not provide that it shall be void if the agreements are not observed. It simply provides that,—

"If the insured shall fail to keep any of the agreements therein contained, this company shall not be liable in case of loss under this policy."

This provision differs from the other provisions referred to. If it was intended that any failure to keep a watchman rendered the policy void, the parties would have so declared. If they had, and no watchman had been kept, and the watchman's duties had not been performed, the policy could not have been subsequently validated, without the consent of both parties, or something equivalent to a waiver of the breach. The agreement here was reciprocal, and this clause in the policy must be construed as though the words, "during such failure" followed the word "policy." The use of the

words "in case of loss" in this connection are unnecessary, unless they refer to a case of loss during such failure.

But it is insisted that the watchman was absent from the mill when the fire occurred. It appears that the watchman went on duty a few minutes before 6 o'clock P. M.; that he went through the mill, and then closed and fastened the doors; that he then visited the machine-shop and other buildings about the premises, and closed them; that, observing that the oat-bin at the barn was not locked, he recollected that he had taken the padlock and key to get it fixed, and had left it at the boarding-house, and had forgotten to bring it with him when he came to go on duty; that the boarding-house was about 300 feet from the mill, and he went over there, was not in the house but a minute or so, got the lock and key, and came back; that, as he came out of the boarding-house, he heard the cry of "Fire!" whereupon he hastened to the mill, opened the door, and discovered that it was on fire. This temporary absence of the watchman cannot be regarded as a violation of the terms of the agreemen contained in this application. The watchman contemplated by the agreement was the one usually kept upon mill premises, having the usual and ordinary duties of watchmen upon such premises, and the watchman here was engaged in the performance of these duties. His trip to the boarding-house was directly in the line of his duty. There was no dispute as to the facts, and no error in the court's direction to the jury to find for the plaintiff.

The judgment is affirmed, with costs.

The other Justices concurred.