## J. D. MAY V. THE STATE.

*No. 292.   Decided January 27.*

1.  **Murder—Qualification of Jurors.**—On a trial for murder, several special veniremen, on their voir dire examination, each stated that they had and entertained an opinion as to the guilt or innocence of the accused, but that they had talked with none of the witnesses, and that said opinion was based upon hearsay and rumor, and that each, notwithstanding any impression or opinion in his mind, could go into the jury box and render a fair and impartial verdict as though he had never heard of the case. *Held,* the juror was competent and not disqualified to sit in the case.

2.  **Murder in the Perpetration of Robbery—Indictment—Charge.**—On a trial for murder, where the facts establish a murder committed in the perpetration of robbery, the charge of the court should instruct the jury, that if they found such to be the case, accused would be guilty of murder of the first degree, though the indictment did not charge a murder committed in the perpetration or attempted perpetration of robbery.  Following Sharpe v. The State, 17 Texas Crim. App., 486.

3.  **Same—Evidence—Conspiracy—Impeachment of Defendant as a Witness.**—On a trial for murder committed in an attempt at train robbery, in which it was shown that several other parties were acting with accused, and defendant, as a witness in his own behalf, had testified that the conspiracy to rob said train was entered into at a certain part of the country and not in the penitentiary, *Held,* that it was competent for the State to impeach his credit by proving that he had made other statements to the effect that the conspiracy was formed between himself and one of his coconspirators while they were convicts in the penitentiary.

APPEAL from the District Court of Karnes.  Tried below before Hon. S. F. GRIMES.

Appellant was indicted in the ordinary form for the murder of one Frank Martin.  The murder was committed in the attempt at robbery of a railroad train on the San Antonio & Aransas Pass Railroad, near the station of Brackenridge, in Karnes County.  At the trial appellant was convicted of murder of the first degree, his punishment being assessed at death.

In the impanelling of the jury defendant challenged, for cause, several of the veniremen, who, on their voir dire examination, stated that they "had formed an opinion from hearsay and rumor, but each stated that, notwithstanding such impression or opinion, he was able to render an impartial verdict upon the law and evidence, and that

such opinion would not influence his action in finding a verdict." The challenges for cause were overruled, and some of these jurors sat upon the trial. Defendant saved exceptions by bill to each of the rulings, and exhausted his peremptory challenges. It is unnecessary to give all the testimony, inasmuch as the important facts are stated by Mike Tearney and the defendant, who testified in his own behalf.

Mike Tearney testified: "Live at San Antonio. I am locomotive engineer on engine number 1, trains numbers 3 and 4, on Corpus Christi Division of San Antonio & Aransas Pass Railroad, and was such on June 28, 1893. Frank Martin was my fireman. On June 28th we were due at Brackenridge at 4:10 p. m. After we had stopped at the depot and transacted the usual business, and had orders to pull out, we had gotten out seventy-five or a hundred feet from the depot when I heard a shot from behind me. I was sitting on my seat, with my hand on the throttle, and my fireman was sitting on his seat on the other side—about five or six feet between us. When I heard the shot I at once turned my head and saw a man, whom I now recognize as defendant, on one knee and foot, stooping, looking down at me, on the coal tender. When I heard the shot in my rear, and turned, I saw Frank Martin, the deceased, throw his hand to his right-side and look back, and I at the same time looked back, and saw defendant on one knee and foot, squatting down, with a pistol in each hand, looking down into the engine cab. I asked, 'What do you want?' and he, raising the pistol in his right-hand slightly up and down, said, 'Pull out! pull out!' I then opened the throttle. The pistol in the right-hand of defendant was smoking from the end of the barrel. Frank Martin (deceased) crawled out at the left-hand cab window, and went along the side of the engine to the front, and as I saw him throw up his hands and fall, or was about to fall, I started out at the right-hand window, on my side of the engine, and as I went I shut off the steam and turned on the air. As I passed along the side of the engine I heard something, as if a man jumping from the coal down into the cab, on the iron apron in front of the boiler grates. I then, in a moment, felt the engine move up, as if the steam had been turned on. After this defendant went first to one side of the engine and shot at me as I dodged around the smokestack and then shot at me again and I jumped off; and as the express car passed me I hallooed to the expressmen that there was a man on the engine with two pistols, and had killed my fireman; to throw on the air. I ran on back to the first coach and hallooed to the conductor and told him to throw on the air, and asked, 'Where is my fireman?' And he said, 'Your poor fireman is back yonder dead, and he said, 'Get on your engine.' I told him there was a man on there with two pistols; and he said, 'Yonder he goes, down the track;' and we uncoupled from the baggage car, and Mr. Steele, the conductor, and Mr. Butler jumped on the engine and

started down the road after him. I saw smoke down the road, but could not hear report of guns. We ran past where defendant was before we saw him, and Mr. Steele and Mr. Butler fired several shots at him. I reversed the engine and pulled back opposite where he was, and Steele and Butler got off and went to him on the engine, and we went back to where deceased (Martin) was. We found deceased lying on the track, with a bullet-hole in his body—the hole going through the right-arm and into his body about opposite the right-nipple, and lodged just over the hip bone on the left-side, and his left-arm cut off about three inches from the body, and the part cut off lying on the inside of the rail and the body on the other. When I first saw defendant he was only a few feet from me, and on the front end of the tender. He was only five or six feet from deceased when the gun fired, and was some nearer me, and was more on the right-hand side of the tender. One standing on the rear of the tender, or in rear of tender, could not shoot a man seated in the cab, where deceased was; the coal would be in the way. We were very heavily loaded with coal on this train, as we always carry enough to do the round trip, which is over 300 miles. We carry about seven and a half or eight tons of coal, and it takes three and a half or four tons to make the trip. We had run only from San Antonio to Brackenridge that day, and the coal bin was full when we started. We had run then about forty miles. The coal bin on the tender is filled highest in front, and has boards across the front to hold the coal back, and the fireman gets his coal from under the boards, so that at the time defendant shot and killed Frank Martin the tender was full of coal, and if a man was standing up on the top of the coal he could not shoot down into the cab where either Martin or I sat, as the top of the cab would be in the way. The coal in the tender at this time was almost as high as the top of the cab. Martin, deceased, was a young man; had been my fireman for a long time, and left San Antonio in the best of health. He was killed on June 28, 1893, by being shot with a pistol by the man at the bar, J. D. May, as he is called in Karnes County, Texas. This man at the bar is the man who did the killing. Martin's name was Frank. Deceased was dead as the engine was running over his arm. The end to the shoulder and the end cut off were just as cut off by the engine wheels; he did not move; the arm was entirely severed from the body. Defendant carried the train, before he jumped off the engine, three or four hundred yards.

Defendant testified: "We went to Brackenridge on the 28th day of June to rob the express train. There were three other men with me, and we camped down near the railroad near the Indian crossing the night before and talked the whole thing over. The boys wanted to derail the train, but I refused, and would not agree to it. It was then decided to adopt my plan, which was for one of us to go to Brack-

enridge and come out on the train to the San Antonio river, and then stop the passenger coaches on the bridge and uncouple and leave them, and then go on out to the culvert in the hollow, where my horse was found, and there rob the express and mail. So we started out, all of us. I rode behind one of them. We went to the bridge, and two of them were to stay there until the train came. The other one was to take the horses back, and I walked across the bridge and on to town. I went into the saloon and drank a bottle of soda water and asked some one how long till train time, and was told that it was about half an hour. I walked down to the depot, and pretty soon the train came, and I walked around on the opposite side from the depot, and stood there several minutes. I heard the men on the engine talking, and one of them asked, 'How is the water?' The other said, 'It is low.' I had to stand there longer than I expected. When the train started I caught on to the blind baggage, and the porter came along and saw me and tried to put me off. I pulled my pistol and he jumped off. I got one of them out, and the other just about out of my pants, when the porter jumped off. I then knew the porter would give me away, and I would have to act quick. So I jumped on the hind end of the tender with both pistols in my hands—one in each hand—and had just passed over the tank and made a step on the coal, when I stepped on a large piece of coal and it rolled under me, throwing me forward, and in my attempt to catch myself threw myself back, so that I fell in a squatting position, when the pistol in my left hand went off. I do not know whether I was sitting flat down or whether I was on one knee and one foot when my pistol fired. When my pistol fired I saw the fireman look round and then jump out of his window. The engineer also looked around and asked me what I wanted. I told him to pull out. He jumped out of the cab and ran around on the side of the engine. I saw the train was slowing, and I got down into the cab and pulled the lever to the throttle first one way and saw it was coming to a standstill; then I threw it the other way, and it pulled out faster. Pretty soon I saw the train was stopping. From what they afterwards told me, they had thrown on the air from behind, and I jumped off the train and ran down the track. When I passed the section house Mr. Smith came out and shot at me three times with a Winchester, and I fired one shot back over my shoulder and fell and emptied one of my pistols at him. I then got up and ran to where I got behind the tree and reloaded one of my pistols and emptied them at Smith. Then the men on the engine came by and shot at me several times and got off the engine and came to me. The conductor said, 'Why did you kill my fireman?' I told him, 'If I killed your fireman I did it accidentally. I stumbled over a coal and fell, and one of my pistols went off. I did not go there to kill any one.' They then took me back to the train and tied me down and took me to Karnes City, where I was

turned over to the sheriff. I told the sheriff where my horse and saddle and gun was. I never saw deceased before that day, and had nothing against him. I did not suppose it would be necessary to kill any one, because, if a man has a gun on me, I will do what he tells me. I am sorry that deceased was killed. I did not know that I had shot anybody until the conductor told me I had killed his fireman. I shot at nobody but Smith, and that was after he had shot at me three times with a Winchester."

Cross-examined by State's attorney: "What is your name?" "I am here under the name of J. D. May. That is not my right name. I refuse to tell my name." "Who were the other three men with you?" "Two Mexicans and a white man." "What are their names?" "I refuse to answer. The conspiracy to rob the train was entered into south of San Antonio." Witness refused to tell what county. Witness refused to tell his people's name, or where he was raised. Witness denied that he told Sheriff Seale that the conspiracy to rob was entered into by himself and J. C. Benningfield while they were in the penitentiary. Witness denies that he was in the penitentiary. Witness is shown a letter directed to J. P. Wright, from Austin, and acknowledged that he wrote it, and says the facts therein stated are true. "Benningfield was one of the men with me. I gave him away because he did not do his part. He was in 100 or 200 yards of me when I was captured, and could have kept the men who were after me back, and I got away. He had a Winchester, as did the other men with him, and did not do anything. I did not expect him to shoot those who were after me, but only to wave their guns at them. I refuse to answer any questions about James P. Wright. I refuse to tell anything about a draft drawn by me in San Antonio on J. P. Wright, at Gonzales, or to tell in what bank in San Antonio the draft was drawn, or to answer anything about the draft. I was at Brackenridge in May to see the place, and see how best to rob the train. I was in the rear of the middle of the coal bin when my pistol went off—did not shoot but once; did not fire at the engineer at all. I refuse to tell anything about the matter, except what happened on the day the train was stopped. I did not tell Mr. Seale, sheriff of this county, while in jail here, or in Austin, that the conspiracy to rob the train was entered into in the penitentiary. I never was in the penitentiary. I first met Benningfield in San Antonio, in 1885; have also seen him out west. I did buy a gun in San Antonio, and those two hats you have and two horses. Benningfield also wore one of the hats and rode one of the horses. My horse was a dun. Benningfield also bought a gun. We went west and crossed the Rio Grande into Mexico to get help to rob the train. My business on that train was to rob it. I carried pistols and guns to intimidate, and not to kill. Did write the James P. Wright letter. You can read it. How did you get it? Let me see

the envelope it came in. Did not mean, when I wrote the letter, to tell Wright that Benningfield ought to have been killed to have saved me from capture."

Redirect: "I refuse to give my name, because my people are nice people, and I do not want to disgrace them."

The letter before referred to was then read by the defense to the jury. It is as follows:

*"Mr. J. P. Wright:*    "AUSTIN, TEXAS, September 14, 1893.

"KIND FRIEND—I thought I would drop you a few lines to let you know that I am still living, and hope this will find you all right. Jim, I feel it my duty to write you this. I know that you knowed nothing of this thing till after it was done. Now, Jim, if you take any sides with Jim Benningfield, Marshal Ware will try to stick you for keeping him at your house, although you did not know there was anything wrong with him. He don't need any help, no way, or don't deserve any. The men that was with me was cowards, or I would not have been caught. I will now give you a little sketch of how it was: I went to that place with three men; they wanted to ditch the train, which I would not do. I left them at the bridge and walked to the depot, a half-mile. The train left at 4 p. m. I got on the blind baggage. The porter tried to put me off, but I put him. I then jumped on the coal box and fell down over a piece of coal, which caused one of my pistols to fire and kill the fireman. When the engineer saw that the fireman was killed he jumped from the cab. I then saw my only chance was to run the train out myself. I then ran down into the cab and pulled the throttle wide open and run the train half-way to the river. They cut me down with the air and the train stopped. Then I jumped off. Everything went to shooting. I ran within one hundred yards of the bridge. I was then give out. I stopped to fight. I shot both of my pistols empty; I reloaded one of them and emptied it again. Jim, them men was in a hundred yards of me, and I don't think they fired a shot. If they had made any fight at all I would have got away, but they left me in the hands of a mob, you might say. Jim, this looks pretty down tough, to be treated that way. I will close as ever, your friend,    "J. D. MAY,

"Care of Sheriff, Austin, Texas.

*"Mr. Jack Wright:*

"KIND SIR—I write this letter in your care. I don't know Jim's postoffice since he moved. Please send him this at once.

"Yours respectf.,    "J. D. MAY."

J. J. Seale, sheriff of Karnes County, testified to the arrest of defendant, and to his placing him in jail; and also testified, after the defendant had testified, that "defendant told me while in jail here, and while

at Austin, that a conspiracy to rob the train at Brackenridge was entered into while he and Benningfield were in the penitentiary; that Benningfield had worked on the San Antonio & Aransas Pass Railway, in its construction, and suggested that as the place; that it was against his judgment; that he had picked out another place on the International & Great Northern Railroad; that he was of opinion they would have to rob this road on a credit. He gave me names of convicts that he said he met in the penitentiary, some from this county. One I remember was George Wages; another Bill Templeton." State's counsel withdrew all objection and allowed the witness to state everything told him by defendant. The hats in court are the two hats, one obtained from Benningfield and the other defendant's hat, found at his horse.

Cross-examined: "Defendant's conduct as a prisoner has been good. He gave me the names of the parties with him. One, he says, was Benningfield, who is now in jail; the others were Mexicans, whose names I do not remember, but have them in my office. This statement about not having been in the penitentiary and there entered into the conspiracy is all I know that he told that is not just as he has stated on the stand. Everything he told me, so far as I have been able to investigate, has been true, and what he has told me has aided me in getting up evidence in this case. He said the other men with him were at the end of the bridge over the San Antonio river, and could have saved him from capture, as they could have shot with their Winchesters, and as they ran and left him to be caught, he would give them away. He seemed to be mad at them."

*F. R. Graves* and *A. J. Bell*, for appellant.—1. The court erred in overruling defendant's challenges for cause to the several special veniremen named in the bills of exception. Tooney v. The State, 8 Texas Crim. App., 455; Rothschild v. The State, 7 Texas Crim. App., 519; Dryer v. The State, 11 Texas Crim. App., 640; Loggins v. The State, 12 Texas Crim. App., 84; Ward v. The State, 19 Texas Crim. App., 689.

2. The court erred in permitting Sheriff J. J. Seale to testify that defendant told him that the conspiracy to rob the train had been entered into between himself and Benningfield while they were convicts in the penitentiary. To this testimony the defendant objected, that the time and place of the conspiracy to rob was not a material issue in the case, and that defendant, as a witness, could not be contradicted or impeached upon an immaterial or collateral matter. Davis v. The State, 20 S. W. Rep., 923; Walker v. The State, 6 Texas Crim. App., 576; Tyson v. The State, 14 Texas Crim. App., 388; Segura v. The State, 16 Texas Crim. App., 221; Brumley v. The State, 21 Texas Crim. App., 236.

3. The court erred in failing to instruct the jury on negligent homicide, there being evidence to show that the killing was done by accident, and defendant was not at the time attempting to execute a robbery or other felony, the railroad train at the time being five miles distant from the place fixed by the conspiracy as the point at which the robbery was to be perpetrated. Curtis v. The State, 22 Texas Crim. App., 227; Reynolds v. The State, 14 Texas Crim. App., 427; Meuly v. The State, 26 Texas Crim. App., 274.

*R. L. Henry*, Assistant Attorney-General, for the State

HURT, PRESIDING JUDGE.—Conviction of murder of the first degree, with the death penalty. Two matters require notice:

Were certain jurors disqualified because they, or either of them, had such an opinion as to the guilt or innocence of appellant as would influence them, or either of them, in finding a verdict? We have carefully examined the bills of exception relating to each venireman, and are of opinion that no juror who served was disqualified because of such an opinion. We have tested them by the rules laid down in the Rothschild case, 7 Texas Criminal Appeals, 519, and other cases on the same line.

The court in its charge alluded to robbery. This was objected to by appellant. The charge did not permit the jury to convict appellant of either of the degrees of murder if they believed that the homicide was committed in the perpetration, or attempt at the perpetration, of robbery, but merely defined "robbery." The facts of the case establish beyond doubt that the murder was committed in the attempt to commit robbery, and the court should have instructed the jury, that if such was the case, appellant would be guilty of murder of the first degree. Sharpe v. The State, 17 Texas Crim. App., 486. The writer dissented in the Sharpe case, because robbery, or an attempt at robbery, had not been alleged; but the Sharpe case is the law of this State, binding upon the trial courts.

The court below gave all the instructions requested by appellant, and also submitted to the jury the question—the vital issue—namely, the condition of appellant's mind at the time he shot and killed the deceased, requiring the jury to believe beyond a reasonable doubt that all the essential elements of murder upon express malice existed before they could convict of murder of the first degree.

Appellant testified; swore that the conspiracy was entered into at a certain part of the country, and not in the penitentiary. The State proved, over objection of appellant, that he had stated that it was formed by Benningfield and himself while they were in the penitentiary. This was competent evidence. It went to his credit. If he

lied about this matter, he may have lied when he stated that the shot was an accident; that he shot at no one until after he left the train, etc.

The record discloses a well-formed plan to rob the train; to rob it at all hazards; to murder all opposing, if necessary to effect the robbery. In fact, from the acts of appellant, we believe that the plan contemplated murder at the first step to accomplish the main object— robbery. Appellant has had a fair trial, and richly deserves his fate. The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.