McGANNON *v.* MICHIGAN MILLERS' MUTUAL FIRE-INSURANCE CO.

1. FIRE INSURANCE—BREACH OF CONDITIONS OF POLICY—CONSTRUCTION OF STATUTE.
   2 Comp. Laws, § 5180, providing that no policy of fire insurance shall thereafter be declared void by the insurer for the breach of any condition thereof if the insurer has not been injured by such breach, or where a loss has not occurred during or by reason of such breach, covers all policies issued in this State after the act went into effect, irrespective of whether they are Michigan standard policies or not.

2. SAME—CONSTITUTIONAL LAW—RIGHT TO MAKE CONTRACTS.
   Such statute is not unconstitutional as depriving fire-insurance companies of the right to make contracts not immoral or contrary to public policy, since, such companies being creatures of statute, the legislature may prescribe the forms of their contracts, and the limitations in relation to the forfeiture clauses therein.

3. SAME—OBLIGATION OF CONTRACTS.
   Nor, being confined in its operation to policies subsequently issued, can it be said to impair the obligation of contracts.

4. FIRE INSURANCE—BREACH OF CONDITION AS TO WATCHMAN.

In view of such statute, a policy conditioned on the keeping of a watchman on the premises continuously is not invalidated by the fact that none is employed on Sundays, so as to prevent a recovery for a loss occurring on a week day.

5. SAME—WARRANTY—CONSTRUCTION.

An application for insurance on a mill contained an agreement by the applicant "to keep a watchman on the premises at all times when not in operation," and provided that the statements in the application should be regarded as continuing warranties. The policy issued thereon made the application a part of the policy, but did not expressly provide that failure to keep a watchman should render the policy void. *Held*, that where the insured employed a competent watchman, and charged him with the duty of watching the premises, the fact that the watchman absented himself in the night-time, without the knowledge of the insured, for more than an hour, during which time the property took fire and was destroyed, did not release the company from liability, since the agreement in question should receive a reasonable interpretation, and a substantial compliance therewith was sufficient. GRANT, J., dissenting.

Error to Ingham; Wiest, J. Submitted January 11, 1901. Decided July 19, 1901.

*Assumpsit* by John George McGannon against the Michigan Millers' Mutual Fire-Insurance Company upon a policy of insurance. From a judgment for plaintiff, defendant brings error. Affirmed.

*Crane, Norris & Drew*, for appellant.

*Cahill & Wood*, for appellee.

MOORE, J. The defendant is a fire-insurance company organized under the laws of the State of Michigan, with its principal office at Lansing, Mich. The plaintiff is the owner, by assignment from the Verona Roller-Mill Company, of a policy of insurance issued to said Verona Roller-Mill Company by the defendant company. In March, 1899, the Verona Roller-Mill Company made a written

application for insurance.   Among other things stated in the application are the following:

"What facilities have you in the way of force-pumps, extinguishers, etc., for putting out fire?

"*A.* Waterworks.

"Do you agree to keep a watchman on the premises at all times when not in operation?

"*A.* Yes.

"Do you agree to keep at least one cask of salt water on each floor of the buildings, and one or more buckets to each cask, always in order and ready for use in case of fire?

"*A.* Yes.

"Do you agree not to use open, movable lights on the premises insured?

"*A.* Yes.

"If both water and steam power are used, state what proportion of the time a permit for steam is wanted.

"Is smoking permitted except in the office?

"*A.* No.

"What is the capacity of the mill in 24 hours?

"*A.* 200 bbls.

"State anything affecting the risk, not otherwise fully explained.

"Through what bank do you prefer to have collections on you made?

"*A.* Farmers' Bank.

"And the undersigned applicant hereby warrants that the above is a just, full, and true exposition of the facts and circumstances in regard to the property to be insured, and is and shall be considered as the basis on which insurance is to be effected and continued in force, and the same is understood as incorporated in and forming a part and parcel of the policy as a continuing warranty during the life of such policy.   And it is covenanted and agreed that if the situation or circumstances affecting the risk shall be so altered or changed as to render the risk more hazardous, or if there be any change affecting the title, interest, or possession of the property, the assured will notify the secretary of said company forthwith, in writing, of such alteration or change."

Upon this application a policy of insurance was issued. The provisions of said policy which counsel deem material in this controversy read as follows:

"* * * Reference is made to assured's application and survey on file in the office of this company, and which is made part of this policy. * * *

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.

"This entire policy, unless otherwise provided by agreement indorsed hereon and added hereto, shall be void if the insured now has, or shall hereafter make or procure, any other contract of insurance, whether valid or not, on property covered in whole or in part by this policy; or if the subject of insurance be a manufacturing establishment, and it be operated in whole or in part at night later than ten o'clock, or if it cease to be operated for more than ten consecutive days. * * *

"If an application, survey, plan, or description of property be referred to in this policy, it shall be a part of this contract, and a warranty by the insured. * * *

"This policy is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements, or conditions as may be indorsed hereon or added hereto; and no officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy, except such as, by the terms of this policy, may be the subject of agreement indorsed hereon or added hereto, and, as to such provisions and conditions, no officer, agent, or representative shall have such power, or be deemed or held to have waived such provisions or conditions, unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

Afterwards a loss occurred, and this suit was brought. A stipulation of facts was filed, the material parts of which read as follows:

"April 17, 1899, at or about 11:30 p. m., fire originated from an unknown cause in the insured property, and the same was totally destroyed by fire. * * * The mill

was generally running from 7 o'clock a. m. until 6 o'clock p. m. It was not running during the night nor on Sundays. The mill company maintained in the mill a small electric-light plant, which furnished electric lights in the village of Verona; said light plant being started up at dusk in the evening, and closing at 10 o'clock p. m. The Verona Roller-Mill Company employed J. U. Robinson, who was also secretary of the company, as one of its engineers and watchmen. He was a competent man to perform the duties for which he was employed. He was hired and had agreed to take charge of the machinery as millwright, engineer, and watchman, as follows: To go on duty at 12 o'clock noon of each day, Sundays excepted, and, so long as the mill was running, to run the engine, do the firing, look after the repairs to the mill machinery, and when the mill ceased running, at 6 o'clock p. m., to run the electric-light plant above referred to until 10 o'clock p. m., and, while running the plant, to perform the duties of night watchman at the mill, and, after 10 o'clock p. m., to remain on the premises and perform the duties of night watchman until 12 o'clock midnight, when he was relieved by W. B. Taylor, and went off duty. He ran the electric-light plant Sundays from dark until 10 p. m., and watched Sunday nights from 10 to 12 p. m.

"W. B. Taylor was employed by the Verona Roller-Mill Company as second engineer and watchman, to perform duties as follows: He was to go on duty every night at 12 o'clock midnight, act as watchman until the mill started up in the morning, when he ran the engine as engineer and fireman until 12 o'clock noon, when he was relieved by J. U. Robinson, and went off duty. On Saturday nights Mr. Taylor went on at 12 o'clock midnight, and watched until daylight, when he went off duty, and no watchman, or other person having the duties of watchman, was in charge of the mill premises on Sundays until the electric-light plant was started up in the evening. The employés and officers of the mill company were around the mill on Sundays, there being some one of them at the mill once or twice each Sunday, but no one performing the duties of watchman on Sundays during the day. Mr. Taylor was a competent man for his employment, and was paid by the Verona Roller-Mill Company for performing the duties as above detailed.

"On the night when the fire occurred, J. U. Robinson ran the electric-light plant until 10 o'clock. At that hour

he shut down the lighting plant, carefully inspected all the stories of the mill, and went home, leaving the mill at about 10:15 p. m.; his wife being quite sick at the time, which was the occasion of his leaving the mill on this occasion prior to 12 o'clock p. m. Robinson went straight home and went to bed, and, at the time the fire broke out, was in bed at his house at the other end of the village of Verona, about 200 yards away from the mill, and out of sight of the mill. The other officers and stockholders of the Verona Roller-Mill Company were not aware that Robinson had left the mill that night. Said Robinson had, on a few occasions prior to the date of the fire, left the mill alone in a similar way between the hours of 10 and 12 o'clock p. m., but his absence on these occasions was likewise unknown to any of the other officers or stockholders of the Verona Roller-Mill Company.

"It is admitted that the officers and stockholders of the Verona Roller-Mill Company used due diligence in the selection of Robinson and Taylor as watchmen at the mill; that Robinson's absence was occasioned solely by the sickness of his wife, who was quite sick; that the mill property destroyed was worth in excess of the total amount of the insurance upon the same; that the company sustained quite a loss not covered by insurance; and that there was no fraud or bad faith upon the part of the plaintiff or his assignor, the Verona Roller-Mill Company.

"It is admitted that all of the conditions and agreements set forth in said application and policy have been fully and literally complied with by the Verona Roller-Mill Company and the plaintiff herein, except as regards the absence of the watchman, as hereinbefore set out, and as to whether this condition of the application for the policy has been complied with is to be determined by the court upon this agreed state of facts; and, if the facts herein set out constitute such a compliance, then judgment is to be rendered for the plaintiff for $2,849.67, with interest at six per cent. per annum from the 25th day of April, 1899; otherwise, judgment is to be rendered for the defendant."

The circuit judge rendered a judgment in favor of plaintiff for the full amount of his claim. The case is brought here by writ of error.

The circuit judge held that section 5180, 2 Comp. Laws,

127 Mich.—41.

applies to this policy of insurance, and the policy did not become void for failure to keep a watchman upon the premises on Sundays; the loss not having occurred during such times, or by reason of the absence of the watchman on Sundays. This policy was issued in March, 1899, nearly two years after the provisions of section 5180, 2 Comp. Laws, took effect. Counsel insist that the provisions of that section apply only to a Michigan standard policy, and that the policy sued upon is not a Michigan standard policy. We do not need to decide whether this policy, issued by a Michigan company, with an indorsement on the back, "Standard Policy," is a Michigan standard policy or not. Section 5180 reads as follows:

"That no policy of fire insurance shall hereafter be declared void by the insurer for the breach of any condition of the policy if the insurer has not been injured by such breach, or where a loss has not occurred during such breach, or by reason of such breach of condition."

This language is broad enough to cover the policy in suit, whether it is regarded as a Michigan standard policy or not, and we think it was intended to cover all policies issued in this State after it became a law. Though there is no direct adjudication to that effect, we think the opinion of the court in this respect is foreshadowed in *Niles* v. *Insurance Co.*, 119 Mich. 252 (77 N. W. 933); *Cronin* v. *Fire Ass'n*, 123 Mich. 277 (82 N. W. 45); *Shelden* v. *Insurance Co.*, 124 Mich. 303 (82 N. W. 1068); *Boyer* v. *Insurance Co.*, 124 Mich. 455 (83 N. W. 124).

Counsel say:

"The act in question is unconstitutional. It puts an unconstitutional limit on the right of parties *sui juris* to make contracts for themselves. The legislature has no authority to deprive a party of his right to make contracts not immoral or contrary to public policy. Any limitation which transgresses this private right is unconstitutional and invalid. Also this statute as now set up by plaintiff impairs the obligation of contract, and is for that reason invalid."

We cannot agree with counsel in this respect. The defendant corporation is a creature of the statute. It could not engage in the business of insurance except by virtue of the statute. It is entirely competent for the legislature to prescribe the forms of its contracts, and the limitations in relation to forfeitures therein. It, of course, would not be competent to impair the obligation of contracts already entered into, but that is not what is attempted to be done here. The idea of the legislature, doubtless, was to protect policy holders, and to see that their insurance did not fail because of any breach in the terms of the policy or the application which did not result in injury to the insurance company. See note *a*, section 156, p. 308, 1 May, Ins. (4th Ed.) and cases there cited.

The court also held that the act of Robinson, the watchman, in leaving the mill the night of the fire at 10:15 p. m., and remaining away from there during the time he was to act as watchman, under the facts stipulated, did not constitute a breach of the warranty which avoided the policy. It is insisted upon the part of the defendant that the application is the basis of the insurance, and the agreement to keep a watchman is a warranty, and the failure to do so avoids the policy. It is said:

"There is no room for construction; no latitude; no equity. If the warranty be a statement of facts, it must be literally true; if a stipulation that a certain act shall or shall not be done, it must be literally performed." 1 May, Ins. (4th Ed.) § 156.

On the part of the plaintiff it is said the agreement to keep a watchman is a promissory agreement, and not a warranty, the literal observance of which is necessary to keep the policy in force, inasmuch as there is no express provision in the policy that a failure to keep a watchman at all times shall make the policy void.

The authorities upon these several propositions are very conflicting. The old rule as to warranties fully sustains the contention of counsel for defendant, but there has been a tendency of late years to hold that the substantial

fulfillment of an agreement like that contained in the application is sufficient. In 1 May, Ins. (4th Ed.) § 156, it is said, after the language before quoted:

"A learned judge and author declares it to be unfortunate that so strict a rule has been established, and intimates—what is no doubt entirely true—that courts are not at all inclined to go beyond the precedents to support a warranty. There are even authorities to the effect that, in dealing with warranties, common sense is not to be lost sight of, and that the fair, practical intent of the parties is to be sought, not the hair-splitting of a college of wit crackers, and that substantial fulfillment of a warranty is enough."

In the policy sued upon it is provided the policy shall be void for any one of 17 different reasons; it also provides the company shall not be liable for loss occasioned by invasion, or for loss resulting from a number of other causes; but it nowhere provides the policy shall be void if a competent watchman is hired by the insured, and is temporarily absent from his post, or if one or more of the buckets to each cask of salt water should be temporarily removed. If it had been intended to avoid the policy for these reasons, it would not have been difficult to say so. The following illustrations will serve to show the tendency of the courts: The case of *Hanover Fire-Ins. Co.* v. *Gustin*, 40 Neb. 828 (59 N. W. 375), was much like the one at bar. We quote from the opinion:

" ' *Watchman.*—Is one kept on the premises during the night, and at all other times when the works are not in operation, or when the workmen are not present?

" '*A.* Yes.

" ' *Q.* Is any other duty required of the watchman than watching for the safety of the premises ?

" '*A.* Yes; cleaning the floors and premises.'

" The evidence shows that the fire occurred about half-past seven o'clock, and that the watchman, with Mr. Gustin, left the premises about 6:15 o'clock. Before their departure, however, the watchman had inspected the different parts of the mill, and found everything apparently safe from fire. He locked up the building, and went to the

business part of the city of Kearney to buy a padlock with which to secure a door of an outside building. While he was gone he went to the depot of the Burlington & Missouri River Railroad Company and purchased a ticket for a lady friend of his, and in the interval between his leaving the planing-mill and returning thereto he ate his supper. While on his way to the planing-mill to resume his duties of watchman, the alarm of fire was sounded. It is insisted that the absence of the watchman for the purposes named, with the assent of Mr. Gustin, necessarily avoided the policy. To this doctrine we cannot assent. Even giving the statements of the application 'that a watchman is kept on the premises during the night, and at all other times when the works are not in operation,' the effect of a warranty,—a claim not necessary now to be settled,—the language should receive a reasonable construction. We are aware that on this proposition there is not accord of authorities; possibly in number they are adverse to this view; yet it is believed that the language of Judge Shaw in *Crocker* v. *Insurance Co.*, 8 Cush. 79, is reasonable and just. He said:

" 'The stipulation, "a watchman kept on the premises," inserted as it is in the body of the policy immediately after the description of the property insured, is in the nature of a warranty, and must be substantially complied with by the assured; but the terms are not explicit as to the time and manner of keeping a watch. It does not stipulate for a constant watch. It therefore requires construction, as matter of law, to determine what is meant in this policy by keeping a watch. It relates to a factory, to its safety against fire; and this depends upon a habit or practice in this respect, and upon the fact whether that usage has been followed. When there is an express stipulation that a thing shall be done, but the contract is silent as to the time and manner, the law holds that it must be reasonable in this respect, having regard to the object and purpose of the stipulation,—in this case, to the safety of the building. If it is done in the manner in which men of ordinary care and skill in similar departments manage their own affairs of like kind, this is one strong ground to hold it reasonable, and to warrant the admission of evidence of usage.'

" The same principle requiring a reasonable construction of the language used is recognized and enforced in *Sheldon* v. *Insurance Co.*, 22 Conn. 235 (58 Am. Dec. 420); *Frisbie* v. *Insurance Co.*, 27 Pa. St. 325; *Houghton* v. *Insurance Co.*, 8 Metc. (Mass.) 114 (41 Am. Dec. 489);

*Percival* v. *Insurance Co.*, 33 Me. 242; *Stout* v. *Insurance Co.*, 12 Iowa, 371 (79 Am. Dec. 539). These views have quite directly received the sanction of this court in *Springfield, etc., Ins. Co.* v. *McLimans*, 28 Neb. 846 (45 N. W. 171)."

It was held the company was liable.

In *Phœnix Assurance Co.* v. *Coffman*, 10 Tex. Civ. App. 631 (32 S. W. 810), the application contained an agreement to have a watchman on the premises constantly at night and at all times when work was suspended. It was held that the insured, by employing a reliable watchman, and charging him with the duty of watching the premises, substantially complied with the contract in that respect, though the watchman may have been asleep at the time of the fire. The court used the following language:

"Appellee testified:                     .

"'At the time of the fire I had a watchman at the mill, named Dean. I employed him as a watchman. I assigned him the duty to be at the mill at a certain hour in the evening, when the hands left, and to stay there until the hands came back in the morning, and to watch the mill to see that nobody bothered anything or stole anything.'

"In the absence of any testimony pointing out more clearly the duties required of a watchman, we must hold that the appellee complied with the contract by placing on the premises a reliable watchman, charged with the duties of watching the property during the night, even though such watchman may have been asleep when the fire began. *Sierra Milling, etc., Co.* v. *Insurance Co.*, 76 Cal. 235 (18 Pac. 267); *Au Sable Lumber Co.* v. *Insurance Co.*, 89 Mich. 407 (50 N. W. 870); *Houghton* v. *Insurance Co.*, 8 Metc. (Mass.) 123 (41 Am. Dec. 494). In the last-named case the question was asked:

"'Is a watch kept constantly in the building? If no watch is constantly kept, state what is the arrangement respecting it.    ·

"'A. No watch is kept in or about the building, but the mill is examined 30 minutes after work.'

"In that case Chief Justice Shaw said:

"'Two questions were made at the trial: First, whether this representation of the usual practice amounted to any condition or

stipulation that it should be continued. It was ruled at the trial, and the whole court are now of opinion, that as this examination was manifestly intended as a substitute for a constant watch; as it was one which the assured had it in their power to make or cause to be made; as it was one of the precautions tending to secure the property against danger of fire, and tending to its safety,—it was one which, as a general practice, the assured were bound to follow, although an occasional omission, owing to accident or to the negligence of subordinate persons, servants, or workmen, not sanctioned nor permitted by the assured, or by their superintendent, manager, or agent, might not be a breach or noncompliance.' "

See *Hovey* v. *Insurance Co.*, 2 Duer, 554; *Crocker* v. *Insurance Co.*, 8 Cush. 79; *London, etc., Ins. Co.* v. *Gerteson*, (Ky.) 51 S. W. 617; *Burlington Fire-Ins. Co.* v. *Coffman*, 13 Tex. Civ. App. 439 (35 S. W. 406).

In *Kansas Mill-Owners', etc., Ins. Co.* v. *Metcalf*, 59 Kan. 383 (53 Pac. 68), in the application the question was asked, "Do you agree to keep a watchman on the premises at all times when the mill is not in operation?" The answer was, "Yes." A watchman was employed, who was in and about the mill until 10 o'clock, when he went to a tent occupied by his family, about 200 feet away, and remained until the fire occurred, nearly two hours later. The company was held liable.

In *Rankin* v. *Insurance Co.*, 89 Cal. 203 (26 Pac. 872, 23 Am. St. Rep. 460), under the facts in that case it was held the company was not liable, but in the opinion the following language is used:

" If a loss is occasioned by the mere fault or negligence of the watchman, unaffected by fraud or design on the part of the insured, it is within the protection of the policy; but, to entitle the insured to recover, it must appear that he has in good faith employed a watchman to perform the duties required by the terms of the warranty. *Trojan Mining Co.* v. *Insurance Co.*, 67 Cal. 27 (7 Pac. 4); *Wenzel* v. *Insurance Co.*, 67 Cal. 438 (7 Pac. 817); *Cowan* v. *Insurance Co.*, 78 Cal. 181 (20 Pac. 408); *Waters* v. *Insurance Co.*, 11 Pet. 219."

In *King Brick Manfg. Co.* v. *Insurance Co.*, 164 Mass. 291 (41 N. E. 277), attached to each of the policies

of insurance was a rider containing, among other things, these words: "Situated on east side of Pleasant river, in Columbia Falls, Maine. Steam pump, with sufficient hose to cover buildings. Constant watch." The watchman was absent when the fire occurred, without the knowledge of the insured. It was claimed the words "constant watch" were a warranty, and not a representation, and that the company was not liable. The court said:

"Was there a breach of any of the terms of the policy by the insured? This depends upon whether the insured absolutely promised that there should be 'a constant watch;' in other words, whether it warranted this, or whether the words constitute a representation, merely, and are governed by the familiar rules applicable to representations. Unless they amount to a warranty, there is no breach of the agreement. In this part of the case we assume, of course, that the first clause of the section is not broad enough to include a statement as to the future.

"It is a familiar rule of construction that a promise in regard to the future, which is not clearly made a warranty, is a representation only, and not a warranty. *Houghton* v. *Insurance Co.*, 8 Metc. (Mass.) 114 (41 Am. Dec. 489); *Daniels* v. *Insurance Co.*, 12 Cush. 416 (59 Am. Dec. 192); *First Nat. Bank* v. *Hartford Fire-Ins. Co.*, 95 U. S. 673; *Garcelon* v. *Insurance Co.*, 50 Me. 580. On the principles laid down in these cases, we cannot regard the words 'constant watch' as constituting a condition precedent to the right to recover, and consider them as a representation that a constant watch would be kept. The duty was thus imposed upon the insured to use all reasonable care, and to take all reasonable means, to see that a constant watch was kept. This was done by making a rule to that effect, and providing a watch. No negligence or fraud is imputed to the insured. The loss was caused by the negligence of a servant, and this is a risk covered by the insurance. There was therefore no breach of the terms of the policy by the insured. *Shaw* v. *Robberds*, 6 Adol. & E. 75; *Dobson* v. *Sotheby*, Moody & M. 90; *Houghton* v. *Insurance Co.*, 8 Metc. (Mass.) 114 (41 Am. Dec. 489); *Daniels* v. *Insurance Co.*, 12 Cush. 416 (59 Am. Dec. 192); *Loud* v. *Insurance Co.*, 2 Gray, 221; *Insurance Co. of North America* v.

*McDowell*, 50 Ill. 120, 131 (99 Am. Dec. 497); *Aurora Fire-Ins. Co.* v. *Eddy*, 55 Ill. 213, 219; *Mickey* v. *Insurance Co.*, 35 Iowa, 174 (14 Am. Rep. 494)."

In *East Texas Fire-Ins. Co.* v. *Harris*, 7 Tex. Civ. App. 647 (25 S. W. 720), the assured agreed to keep correct books and the last inventory locked in a fireproof safe, or in some place not exposed to fire, and in case of loss to produce the books and inventory. They were kept as required, but, when the store was on fire, the book-keeper, fearing the safe was not fireproof, took the books and inventory to remove them to a safe place. As he ran out of the building he dropped some of them, and they were destroyed by fire. The company claimed, by way of defense, that plaintiff must literally comply with his covenant, and produce the books and inventory after the loss, before he could recover. The court declined to so hold, and the company was held liable.

The case of *Liverpool, etc., Ins. Co.* v. *Kearney*, 36 C. C. A. 265, 94 Fed. 314, was much like the last case. Among other things, the court said:

"Counsel for the defendant company direct our attention, however, to the last paragraph of the 'iron-safe clause,' and urge, in substance, that the stipulation therein contained bound the plaintiffs, in any event, to produce the inventory after the fire, and that, even though it was lost and cannot be produced, they are not entitled to recover. This argument proceeds upon the theory that the last paragraph of the 'iron-safe clause' must be read literally, that it admits of no exceptions or qualifications, and that the failure to produce the books or inventory for any reason vitiates the policies. We cannot assent to this view of the case. Like all contracts made between private parties, and like all statutes, for that matter, they must recieve a reasonable niterpretation, which will not work injustice or lead to absurd consequences. *U. S.* v. *Kirby*, 7 Wall. 482; *Heydenfeldt* v. *Mining Co.*, 93 U. S. 634; *Church of Holy Trinity* v. *U. S.*, 143 U. S. 457, 460, 461 (12 Sup. Ct. 511); *Scott* v. *Latimer*, 33 C. C. A. 1, 89 Fed. 843; *Thurber* v. *Miller*, 14 C. C. A. 432, 67 Fed. 371, 32 U. S. App. 209; *Davis* v. *Bohle*, 34 C. C. A. 372, 92 Fed. 325."

See, also, *First Nat. Bank* v. *Hartford Fire-Ins. Co.*, 95 U. S. 673; *Au Sable Lumber Co.* v. *Insurance Co.*, 89 Mich. 407 (50 N. W. 870); *Spies* v. *Insurance Co.*, 97 Mich. 310 (56 N. W. 560).

Judgment is affirmed.

MONTGOMERY, C. J., and LONG, J., concurred with MOORE, J.

GRANT, J. (*dissenting*). I cannot concur with my Brethren in this case. Plaintiff agreed to keep a watchman upon the premises at all times when the mill was not in operation. The watchman whom plaintiff employed left his post in the night, went to his home, and retired to his bed. Who assumed the duty to keep the watchman? The plaintiff. Who assumed the risk of neglect of that duty by him? Clearly, it seems to me, the plaintiff. It was not contemplated that the defendant company should undertake to see that the watchman performed his duty or should be responsible for such neglect. Under the holding of my Brethren, the premises might be unwatched night after night, and still the defendant would be liable. While there is an apparent conflict in the authorities on the question of warranties, I think the following rule is in harmony with the great weight of authority:

"The courts are reluctant to import terms of warranty contained in the application for insurance into the completed agreement, when the policy does not clearly disclose the parties' agreement to the union of the two papers in one contract. *Phœnix Life-Ins. Co.* v. *Raddin*, 120 U. S. 183 (7 Sup. Ct. 500). But when there is a distinct agreement that the application is a part of the contract, and the statements in the application, upon which the contract is based, are expressly declared to be warranties, the insured's intent to bind himself to the exact truth in his answers, even as to immaterial facts, is adequately manifested, and the parties themselves thereby agree upon the materiality of the things warranted. *Burritt* v. *Insurance Co.*, 5 Hill, 188 (40 Am. Dec. 345); *Armour* v. *Insurance Co.*, 90 N. Y. 450; *O'Shaughnessy* v. *Co-operative Ass'n*, 28 N. Y. Supp. 761; *American Credit In-*

*demnity Co.* v. *Manufacturing Co.*, 36 C. C. A. 671, 95 Fed. 111; *Mutual Life Ins. Co.* v. *Nichols*, (Tex. Civ. App.) 24 S. W. 910." 1 May, Ins. (4th Ed.) § 159, p. 319, note *a*.

Applying this rule to the facts of this case, I am compelled to hold that the agreement to keep a watchman upon the premises at all times when the mill was not in operation was a warranty to do so, and that its breach avoided the policy. See *American Ins. Co.* v. *Gilbert*, 27 Mich. 433; *Hoose* v. *Insurance Co.*, 84 Mich. 317 (47 N. W. 587, 11 L. R. A. 340).

I think the judgment should be reversed.

HOOKER, J., did not sit.