**CENTENNIAL INSURANCE COMPANY,**
Appellant,

v.

**DOWD'S INC., a/k/a Dowd's Radio and
Electric Company, Appellee.**

No. 6609.

District of Columbia Court of Appeals.

Argued Nov. 7, 1972.

Decided June 21, 1973.

F. Wainwright Barnes, Washington, D. C., for appellant.

William G. Allen, Washington, D. C. with whom Francis J. Ortman, Washington, D. C., was on the brief, for appellee.

Before GALLAGHER, NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellee Dowd's Inc. operates a retail appliance business at 4418 Connecticut Avenue; appellant Centennial Insurance Company is Dowd's insurer with respect to certain aspects of its operations.

In purchasing insurance coverage against theft, it was necessary for Dowd's to decide what policy limits to have for certain types of risks. Considering the amount of cash which might be on the premises (or collected by drivers making C.O.D. shipments) while the store was open for business, a limit of $2,500 was decided upon for robbery. Considering both cash and the value of the amount of merchandise which might be placed in a large van at one time, a limit of $15,000 was agreed upon for burglary or "robbery of a watchman" during non-business hours.

Closing time arrived at 6:00 p. m. on Saturday, December 6, 1969. Four employees were on duty at the store. All customers had left. Normal closing duties were being performed, and the front and rear doors had been locked. Shortly a burglar alarm would have been set; Dowd's did not employ a night security guard.

A knock was heard at the front door. Tim Dowd (the owner's son) went to the door, and saw two men whom he did not recognize. He unlocked the door, opened it slightly, and advised the men that the store was closed. The men then drew guns and entered. They compelled Dowd to unlock the door to the rear loading dock, whereupon a third intruder came through that entrance. All four employees were tied up and forced to lie on the floor; one was struck on the head with a revolver.

The three intruders then loaded television sets and a variety of other appliances into a van belonging to Dowd's. They also took money and checks, and drove off in the van. As would be expected, no visible marks of forcible entry or exit were left on either of the doors of the store.

Counsel for both sides in the trial court commendably agreed upon a statement of facts, thereby obviating the necessity for an evidentiary trial. The total cash value of the stolen merchandise was $11,007.89. Cash totaling $123.46 was taken and the face value of the stolen checks amounted to $1,514.41. Several days after the crime, the van was found abandoned. In it were all of the stolen checks. None of the merchandise or cash was recovered. The total loss (cash and merchandise) suffered by Dowd's thus amounted to $11,131.35.

The coverage limit of $15,000 was applicable to burglary or robbery of a watchman "while the premises are not open for business." As relevant here, burglary was defined as "the felonious abstraction of insured property . . . from within the premises by a person making felonious entry therein by actual force and violence, of which force and violence there are visible marks . . . upon, or physical damage to, the exterior of the premises at the place of such entry. . . ." Robbery of a watchman was defined as "the taking of insured property by violence or threat of violence inflicted upon a private watchman employed exclusively by the Insured and while such watchman is on duty within the premises." Since the store was not open for business at the time of the incident, Dowd's took the position that burglary or robbery of a watchman had occurred, making applicable the policy limit of $15,000 rather than $2,500.

The incident occurred on the evening of Saturday, December 6; it was reported to the insurer's agent on Monday, December 8. On the next day, a statement describing

the circumstances and an itemized list of the articles stolen (with their value) were submitted by Dowd's president, Robert T. Dowd, to a claims adjuster for Centennial. By letter dated December 12, 1969, the insurance carrier submitted a proof of loss form to be signed by Mr. Dowd. However, in preparing that proof of loss, the carrier expressly limited its coverage to $2,500, taking the position that the robbery clause was controlling rather than the burglary or robbery of a watchman clause. Mr. Dowd refused to sign that form, apparently believing that signing it could have constituted a waiver of the higher coverage level.

Several months passed. Dowd's then engaged counsel, who wrote to Centennial's agent on June 16, 1970, making demand for the full loss. That letter was forwarded by the agent to the insurance company. On July 15, 1970, the company advised Dowd's counsel that the entire claim was being disallowed since the insured had not submitted a signed proof of loss within 90 days of the theft.[1] Dowd's replied that its claim had been timely filed. On August 3, 1970, the carrier wrote Dowd's counsel again, stating in part: "It is our position that the Company completely disclaims coverage under [your policy]. We must refuse to make any offer of settlement."

The policy provides that no action may be brought thereunder unless it is initiated within one year of the discovery by the insured of the occurrence giving rise to a claim.[2] Following Centennial's letter of outright rejection dated August 3, 1970, no further communication of any kind took place between the parties until July 15, 1971. On that date, Dowd's filed suit, some 19 months after the incident had occurred.

Centennial filed a motion for summary judgment, arguing that the entire cause of action was barred because of the failure to have brought suit within one year. After a hearing, the motions judge apparently concluded that the one-year limitation period should be computed from the date when the carrier denied liability, rather than from the date of the theft. He denied the motion.

A date for trial subsequently was set. As noted, the parties agreed upon a statement of facts, leaving the trial judge solely with questions of law. He properly considered the earlier denial of the motion for summary judgment to be the law of the case. *Cf.* Jenkins v. United States, D. C.App., 284 A.2d 460 (1971). After a full hearing, the trial court ruled that the $15,000 coverage limit was applicable. Judgment accordingly was entered in favor of Dowd's in the amount of its full loss, $11,131.35.

Both parties agree that the two issues before us are: (1) Is the entire claim barred for Dowd's failure to file suit within 12 months of the loss? (2) Is the loss a "robbery" or a "burglary or robbery of a watchman" within the definitions of the insurance policy?

Initially, the policy is explicit to the effect that an action thereunder must be instituted within 12 months of the occurrence (or discovery thereof) giving rise to a claim. Such a provision may not be rewritten judicially to have the limitation period run from the time of the denial of coverage.[3] Absent other factors, the mo-

---

1. Such a position, patently inequitable, was abandoned by Centennial in the trial court.

2. It states:
   No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim . . . [unless state law prohibits such a contractual limitation period].

3. A limitation period based upon the date of the incident is clearly defined, and avoids disputes as to when a claim may or may not have been "denied."

tion for a summary judgment should have been granted. Roumel v. Niagara Fire Insurance Co., D.C.App., 225 A.2d 658 (1967).

■ Dowd's contends that the 12-month limitation period should be rejected as being contrary to public policy. We do not agree. The possibility of fraudulent claims regretably looms ever-present in the realities of the insurance industry. While it is within the power of Congress to legislate in this area, it has not done so, and we see no basis for our invalidating such a contractual provision.

■ It is well recognized that if conduct by an insurance carrier causes an insured to delay the institution of a suit beyond the expiration of the limitation period, an insured is free to present evidence to such effect in an effort to demonstrate that a carrier is estopped to assert a defense of limitation. Property 10–F, Inc. v. Pack & Process, Inc., D.C.App., 265 A.2d 290 (1970); Roumel v. Niagara Fire Insurance Co., supra at 660 of 225 A.2d. No such facts exist here; Centennial unequivocally rejected Dowd's claim nearly four months before the 12-month period expired. Dowd's was not lulled by its carrier into inaction, and adequate time existed within which Dowd's reasonably could have been expected to file suit to protect its interests. E. g., Pinion v. Pennsylvania Millers Mutual Insurance Co., La.App., 245 So.2d 733 (1971); Bernstein v. Connecticut Fire Insurance Co., Okl., 315 P.2d 232 (1957). But for the factor now to be discussed, the expiration of the 12-month period would have been available to Centennial as a valid defense.

■ The inhibition against Centennial's successful reliance on the contractual limitation period arises from its own conduct. It has never contended that the loss did not occur as represented by Dowd's. Consistent therewith, Centennial sent to Dowd's a proof of loss form only six days after the incident which presumably would have led to a prompt payment of $2,500. Dowd's unwillingness to risk waiving its claim for higher coverage by signing that document was reasonable. Centennial's sole response thereto was to deny all liability, although the insured's loss clearly had to be attributable to either robbery or burglary as defined in the policy.[4]

Centennial has sought to defend based upon Dowd's breach of its contractual obligation to initiate suit within 12 months of the loss. However, Centennial breached its own contractual obligation to pay Dowd's the minimum of $2,500 to which the insured was entitled. Had it made such a payment, it would have had every right to deny greater liability, and to rely successfully on the lapse of the limitation period. Its unwillingness to have done so renders the limitation defense unavailable to it. Warren v. Employers' Fire Insurance Co., 53 N.J. 308, 250 A.2d 578 (1969); Agricultural Insurance Co. of Watertown, N.Y. v. Iglehart, Okl., 386 P.2d 145 (1963).

■ We turn now to the question of whether coverage of Dowd's loss was limited by the $2,500 robbery clause or by the $15,000 burglary or robbery of a watchman clause. As we view the case, the parties agreed essentially upon two categories of coverage: the first while the store was open for business; the second while it was not. Thus, the coverage for burglary or robbery of a watchman was intended to pay for loss "while the premises are not open for business." The trial judge concluded, and we agree, that Dowd's was not open for business at the time of the incident.

As we further see the problem, the parties agreed upon two categories of covered loss while the store was not open for business: burglary, meaning theft "from within the premises by a person making feloni-

4. After its motion for summary judgment had been denied, Centennial acknowledged in the trial court that Dowd's was assured a recovery of $2,500.

ous entry therein by actual force and violence, of which . . . there are visible marks . . . ."; or robbery of a watchman. The first category contemplated coverage while the premises were unattended; the second contemplated coverage while the premises were attended during other than business hours. We conclude that the occurrence constituted robbery of a watchman within the purview of the policy.

The policy defines robbery of a watchman as "the taking of insured property by violence or threat of violence inflicted upon a private watchman employed exclusively by the Insured and while such watchman is on duty within the premises." The only questionable element of that definition in this case is the term "watchman."

If the incident had occurred a few minutes earlier, while the store was open for business, unquestionably it would have constituted robbery. Had the intruders come a few minutes later, after the burglar alarm had been set and all employees had left the premises, only a burglary would have been possible. However, when the incident did occur, four persons "employed exclusively by the Insured" were "on duty within the premises." Their whole reason for being there was to further and protect the interests of Dowd's. It is true that they were not labelled "watchmen," but we cannot view a mere label as controlling in these circumstances.[5] See Au Sable Lumber Co. v. Detroit Manufacturers' Mutual Fire Insurance Co., 89 Mich. 407, 50 N.W. 870, 872 (1891).

The trial judge concluded that the $15,000 limitation was applicable. While he did so without stating his reasons, the transcript of the hearing which preceded his order indicates that he was of the view that the incident constituted burglary and that the "visible marks" language of the policy presented an evidentiary question which was obviated by the agreed facts. We do not reach the "visible marks" ques-

tion. We place the loss in the "robbery of a watchman" category, and our conclusion to that effect is consistent with the result reached below. The judgment in favor of Dowd's in the amount of $11,131.35 accordingly is

Affirmed.

5. The policy specifies no qualifications for a "watchman," nor does it require that one be armed.